MEYERS, Appellee and Cross–Appellant,

v.

HOT BAGELS FACTORY, INC., et al. Appellants and Cross–Appellees.

[Cite as *Meyers v. Hot Bagels Factory, Inc.* (1999), 131 Ohio App.3d 82.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–980199, C–980241.

Decided Jan. 22, 1999.

*Sirkin, Pinales, Mezibov & Schwartz, Marc D. Mezibov* and *John P. Feldmeier,* for appellee and cross-appellant.

*Bruce B. McIntosh,* for appellants and cross-appellees.

PAINTER, Judge.

Appellee/cross-appellant Kathleen A. Meyers met Steven Clark and Pat Shea for a sandwich at a local restaurant/bagel store known as Marx Hot Bagels. Appellant/cross-appellee John Marx is the president of appellant/cross-appellee Hot Bagels Factory, Inc., a company comprising four bagel stores, including Marx Hot Bagels. Meyers and her companions entered the bagel store, sat at the counter, and ordered their food. At some time Meyers placed an order to go. At the end of the meal, Clark and Marx engaged in a conversation in which Clark informed Marx that Meyers preferred a competitor's menu. After that conversation, Marx, in the presence of everyone in the store, walked up to Meyers and said, "You look like a classy lady, what are you doing with him? You must be a really good fuck. Are you a good fuck?" He then proceeded to tell her a sexual anecdote about two customers. At the conclusion, he asked Meyers, "So are you? Are you a good fuck?" Marx asked Meyers if she was embarrassed. She told him that he was disgusting, that he was humiliating her, and that he owed her an apology. As she then turned to get her carryout order, Marx stated, "I can see you have a nice firm ass. You must really be a good fuck. Are you? Are you really a good fuck?"

Meyers's testimony was substantially corroborated by Clark and Shea. Clark also testified that Marx said, "Women are only good for fucking." Shea testified that he heard Clark and Marx engage in banter and that he heard Marx make a comment about Clark being with a younger woman. He said Marx commented that Meyers had "a nice ass" and "something like she's got a nice ass or are you fucking her, too."

Marx testified he had no memory of the incident and that he felt victimized by the lawsuit. A salesman and an employee in the store on the day of the incident

testified that they did not hear Marx say "fuck" or "ass." The employee testified that Marx was aggressive and that a lot of what he did in the restaurant could be misconstrued. He described the atmosphere of the restaurant as "wild and wacky."

Subsequently, Meyers described the incident as a "brutal attack" and a "verbal rape." She was upset. Soon after the incident and the filing of this lawsuit, Meyers saw Marx walking in front of her house and became very frightened. Her sister, who also saw Marx that day, described him as stomping past Meyers's house in his uniform, clutching his hat. She testified he "appeared to have a temper as he was walking past." After seeing Marx in her neighborhood, Meyers put steel bars on all the windows of her house and began to sleep with a baseball bat next to her bed and a golf club next to her son's bed.

After the incident, Meyers was unable to sleep, eat, concentrate, or work, and became less socially active. Her friends and family noticed the difference in her personality and told her she needed to seek professional help. She contacted Dr. Myszak, a psychologist, and had five sessions with her. Myszak diagnosed Meyers as experiencing posttraumatic stress syndrome.

Myszak testified that the incident at Marx Bagels was the cause of Meyers's posttraumatic stress syndrome, that Meyers's reaction was not an overreaction, and that any woman would have reacted strongly. She stated that Meyers's involvement in a prior abusive relationship was relevant in terms of Meyers's reaction to Marx's conduct, but that even had Meyers not had that history, she would have sought help following the incident with Marx. She also testified that she believed Meyers would experience future emotional difficulties as a result of the incident and would require further treatment.

## I. COMPLAINT AND TRIAL

Meyers's complaint asserted three claims: (1) that Marx violated her right to be free of gender discrimination with respect to public accommodations under R.C. 4112.02(G), (2) that his conduct constituted intentional infliction of emotional distress, and (3) that his actions constituted sexual harassment. The trial court granted summary judgment to Marx on the claims of gender discrimination and sexual harassment.

Meyers tried her claim of intentional infliction of emotional distress to a jury. The jury found in her favor and awarded her $15,000 in compensatory damages and $50,000 in punitive damages. It also determined that she was entitled to attorney fees. The trial court awarded her $22,171.25 in attorney fees and $1,345.10 in costs. Marx filed a motion for judgment notwithstanding the verdict

or, alternatively, a motion for a new trial, which the trial court denied. Marx filed an appeal and Meyers filed a cross-appeal. We first address Marx's appeal.[1]

## II. MARX'S APPEAL

Marx raises five assignments of error. In his first assignment, he challenges the trial court's denial of his motions for summary judgment, directed verdict, and judgment notwithstanding the verdict ("jnov"). In his second assignment, Marx claims that the trial court erred in denying his motions on the issues of attorney fees and punitive damages. Marx contends in his third assignment that the trial court erred in failing to grant him either a mistrial or a new trial. Marx argues in his fourth assignment that the trial court erred in failing to hold that the punitive-damage award was excessive. In his last assignment, Marx claims that the trial court erred by denying his request for an oral hearing on the issue of attorney fees.

### A. Waiver of Error Concerning Directed Verdict

Marx argues in his first assignment that the trial court erred in denying his motions for summary judgment, directed verdict, and judgment notwithstanding the verdict. He claims that Meyers failed to prove negligent infliction of emotional distress, because the record is devoid of evidence demonstrating (1) that he knew or should have known his comments would result in serious emotional distress or (2) that there was a specific threat of physical harm. We need not concern ourselves with Marx's argument regarding negligent infliction of emotional distress. The only claim on which Marx was denied summary judgment and that went to trial was Meyers's claim for intentional infliction of emotional distress.

We first address that portion of Marx's assignment concerning his motion for directed verdict. Our review of the record shows that Marx moved for a directed verdict at the end of Meyers's case-in-chief. He failed to renew the motion at the close of all the evidence. A directed-verdict motion raised after the presentation of the plaintiff's case must be renewed at the conclusion of all the evidence to preserve the error for appeal.[2] Marx's failure to renew his motion constitutes a waiver of any error in the trial court's refusal to grant a directed verdict.

---

1. We have removed this case from the accelerated calendar.

2. *Helmick v. Republic–Franklin Ins. Co.* (1988), 39 Ohio St.3d 71, 529 N.E.2d 464, paragraph one of the syllabus; *Felden v. Ashland Chem. Co., Inc.* (1993), 91 Ohio App.3d 48, 54, 631 N.E.2d 689, 693.

We next address Marx's assignment of error as it relates to the denial of his motion for summary judgment. When determining whether to grant summary judgment, a trial court must, upon viewing the evidence most favorable to the nonmoving party, determine whether there is no genuine issue of material fact, whether the moving party is entitled to judgment as a matter of law, and whether reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party.[3]

### B. Defamation Unnecessary to Prove Intentional Infliction of Emotional Distress

Marx argued in his summary-judgment motion that he was entitled to judgment as a matter of law because Meyers could not prove defamation. This argument fails. Meyers did not have to prove an underlying cause of action. A claim for intentional infliction of emotional distress is an independent action.[4] The trial court did not err in concluding that Marx was not entitled to summary judgment on this basis.

### C. Two Forms of Intentional Infliction of Emotional Distress.

As to Marx's assignment concerning the denial of his jnov motion, the issue is whether, with the evidence and admissions construed most strongly in favor of Meyers, there was substantial evidence to support her side of the case upon which reasonable minds could have reached different conclusions. If such evidence was presented at trial, the trial court correctly denied Marx's motion.[5] A jnov motion presents questions of law, not questions of fact, although evidence must be reviewed and considered.[6] Marx argues that his motion should have been granted because Meyers failed to demonstrate that he was aware of her vulnerable position.

### 1. Emotional Distress Based on Outrageous Conduct

Ohio recognizes two types of actions for intentional or willful misconduct resulting in emotional distress. The first type of case is one in which the

---

3. *State ex rel. Howard v. Ferreri* (1994), 70 Ohio St.3d 587, 639 N.E.2d 1189; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 471–472, 364 N.E.2d 267, 274.

4. *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666.

5. See *Pariseau v. Wedge Products, Inc.*, (1988), 36 Ohio St.3d 124, 522 N.E.2d 511, citing *Posin v. A.B.C. Motor Court Hotel, Inc.* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 429–430, 344 N.E.2d 334, 338.

6. See *Tulloh v. Goodyear Atomic Corp.* (1994), 93 Ohio App.3d 740, 746–747, 639 N.E.2d 1203, 1207.

relationship between the plaintiff and the defendant is not necessarily of primary importance. In that situation, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress." [7] We have further explained these elements in *Ekunsumi v. Cincinnati Restoration, Inc.,*[8] where we held that in order to recover on a claim for intentional infliction of emotional distress, a plaintiff must prove that "(1) the defendant either intended to cause emotional distress or knew or should have known that its conduct would result in serious emotional distress to the plaintiff; (2) defendant's conduct was outrageous and extreme beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) defendant's conduct was the proximate cause of plaintiff's psychic injury; and (4) plaintiff's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it."

■ The outrageousness of a defendant's conduct in and of itself can demonstrate his intent to cause emotional distress.[9] Ohio has adopted Section 46(1) of the Restatement of Law 2d, Torts (1965) and the accompanying comments as standards to be used in deciding emotional-distress cases.[10] The Ohio Supreme Court has found especially instructive Comment *d* to Section 46, which states:

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

"The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflatter-

---

7. *Yeager v. Local Union 20,* 6 Ohio St.3d at 369, 6 OBR at 421, 453 N.E.2d at 666, syllabus.

8. (1997), 120 Ohio App.3d 557, 562, 698 N.E.2d 503, 506.

9. See *Reamsnyder v. Jaskolski* (1984), 10 Ohio St.3d 150, 10 OBR 485, 462 N.E.2d 392; *Yeager v. Local Union 20, supra,* 6 Ohio St.3d at 375, 6 OBR at 426–427, 453 N.E.2d at 671; *Phillips v. Mufleh* (1994), 95 Ohio App.3d 289, 642 N.E.2d 411.

10. *Yeager v. Local Union 20, supra,* at 374, 6 OBR at 425–426, 453 N.E.2d at 671.

ing opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam."[11]

■ The defendant's conduct must be viewed in context because "[t]here are situations naturally fraught with antagonism and emotion where a person must be expected to endure the resultant antagonism and mental anguish." [12]

■ The definition of "serious emotional distress" is the same in cases involving intentional or negligent infliction of emotional distress where a contemporaneous physical injury is not suffered.[13] The definition uses an objective standard.[14] The claimed injury must be such that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." [15] In other words, compensable emotional injuries are those that are severe and debilitating to a reasonable person.[16] As explained in Comment *j* to the Restatement of Law 2d, Torts (1965), Section 46,

"The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge."

■ A court must determine as a matter of law "whether there was proof of emotional distress that was more than trifling, mere upset, or hurt feelings." [17] If such proof exists, the trier of fact then determines whether the "emotional distress actually suffered reached the level of serious or debilitating emotional distress." [18] Unlike the "normal" tort cases, in a case of purely emotional injury, the tortfeasor does not "take the plaintiff as he finds her" unless he knows of her

11. *Yeager v. Local Union 20, supra*, 6 Ohio St. 3d at 374–375, 6 OBR at 425–427, 453 N.E.2d at 671, quoting 1 Restatement of the Law 2d, Torts (1965) 73, Section 46(1), Comment *d*.

12. *Stepien v. Franklin* (1988), 39 Ohio App.3d 47, 51, 528 N.E.2d 1324, 1330.

13. *Uebelacker v. Cincom Systems, Inc.* (1988), 48 Ohio App.3d 268, 276, 549 N.E.2d 1210, 1220, citing *Yeager v. Local Union 20, supra*.

14. Accord *Smith v. Kings Entertainment Co.* (1994), 99 Ohio App.3d 1, 649 N.E.2d 1252.

15. *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759, paragraph 3(a) of the syllabus; see *Dickerson v. Internatl. United Auto Workers Union* (1994), 98 Ohio App.3d 171, 182–183, 648 N.E.2d 40, 48.

16. *Binns v. Fredendall* (1987), 32 Ohio St.3d 244, 246, 513 N.E.2d 278, 280.

17. *Id.* at 246, 513 N.E.2d at 280, fn. 1.

18. *Id.*

particular susceptibility.[19] In this case, Meyers did not necessarily have to prove that Marx knew of her vulnerabilities, only that the emotional reaction she suffered was such that "no reasonable man [or woman] could be expected to endure it." [20]

## 2. Emotional Distress Based on Public Policy

■ Ohio also recognizes an actionable form of emotional distress in cases where the business relationship of the plaintiff and defendant creates a situation where the plaintiff is entitled to protection by the defendant. In that situation, the plaintiff may recover for "any injuries, including fright and terror, which result from a willful breach of duty, insult or unlawful treatment." [21] Cases that have recognized this type of willful or intentional infliction of emotional distress date from 1911 to the present and include the removal of a ten-year-old child from a streetcar at night because the only coin he had for the fare was mutilated [22] and a hotel's refusal to provide a guest access to his room because he had HIV.[23]

■ Liability is premised on public policy. The defendant, by "carrying on a business of a public nature, is by law charged with the duty of extending to his guests 'respectful and decent treatment,' and of refraining from willful conduct toward them that would interfere with their comfort or humiliate or distress them. In other words, here is a situation where for reasons of policy and because of the relationship of the parties, the law gives the plaintiff redress for mental distress and humiliation caused by the defendant's insulting conduct." [24] In this situation, the insults may amount to less than extreme outrage in that the special relationship compels a higher than normal duty of care. Further it is the willful conduct of the defendant and not necessarily the seriousness of the emotional distress that gives rise to liability under this type of case.[25]

---

19. See *id.* at 247, 513 N.E.2d at 280.

20. *Pyle v. Pyle* (1983), 11 Ohio App.3d 31, 34, 11 OBR 63, 66, 463 N.E.2d 98, 103.

21. *Yeager v. Local Union 20, supra,* at 373, 6 OBR at 421, 453 N.E.2d at 670, fn. 2. See *Phillips v. Mufleh, supra.*

22. *Cincinnati N. Traction Co. v. Rosnagle* (1911), 84 Ohio St. 310, 95 N.E. 884.

23. *Phillips v. Mufleh, supra.*

24. Magruder, Mental and Emotional Disturbance in the Law of Torts (1936), 49 Harv.L.Rev. 1033, 1051–1052.

25. See *Phillips v. Mufleh, supra,* 95 Ohio App.3d at 295–296, 642 N.E.2d at 416.

### 3. Neither Emotional–Distress Claim Requires Knowledge of Vulnerability

Neither of these forms of intentional infliction of emotional distress specifically requires proof of a defendant's knowledge of a plaintiff's emotional vulnerability. Meyers entered Marx's restaurant as a customer. By viewing Marx's conduct in the context of a customer-proprietor relationship, and by construing the evidence most strongly in favor of Meyers (including Dr. Myszak's testimony that Meyers's reaction was not an overreaction and that "any woman" would have strongly reacted), we conclude that the trial court's denial of Marx's jnov motion was warranted under either type of emotional-distress claim.

### 4. First Amendment Does Not Protect All Speech

Marx also argues that being held civilly liable for committing the tort of intentional infliction of emotional distress violates his First Amendment right to freedom of speech. This argument has no merit in this context. Not all categories of speech are constitutionally protected. "The First Amendment generally prevents government from proscribing speech * * * because of disapproval of the ideas expressed." [26] Our constitution does, however, permit "restrictions upon the content of speech in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " [27] Included within those areas are speech that is lewd and obscene or profane and libelous, and insulting or fighting words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." [28] To determine whether a party's language constitutes restricted speech, one must look at the circumstances surrounding the language.[29]

Marx has provided us with no set of facts to demonstrate that his verbal assault on Meyers was protected. He was rude and offensive. His words were found to have caused emotional distress. Further, it was likely that an average person would have been provoked to breach the peace in the context of this case upon hearing the words spoken by Marx. Meyers entered the restaurant as a customer, paid money to Marx for the services she received, and was then

---

**26.** *R.A.V. v. St. Paul, Minnesota* (1992), 505 U.S. 377, 382, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305, 317.

**27.** *R.A.V. v. St. Paul, Minnesota, supra,* at 382–383, 112 S.Ct. at 2542–2543, 120 L.Ed.2d at 317, quoting *Chaplinsky v. New Hampshire* (1942), 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031, 1035.

**28.** *State v. Presley* (1992), 81 Ohio App.3d 721, 723–724, 612 N.E.2d 353, 354, citing *Chaplinsky v. New Hampshire* at 572, 62 S.Ct. at 769, 86 L.Ed. at 1035.

**29.** *Id.*

publicly humiliated in front of a roomful of strangers and her friends. Marx's speech was not protected by the First Amendment. We overrule his first assignment of error.

### D. Punitive Damages Require a Showing of Actual Malice

In his second assignment of error, Marx argues that the trial court erred in denying his motion for a new trial or for jnov on the award of punitive damages and attorney fees, because the evidence failed to support a claim for punitive damages. Based upon his argument in his motion, Marx was relying for a new trial on Civ.R. 59(A)(7)—the judgment is not sustained by the weight of the evidence.[30] To reverse the trial court's denial of Marx's motion for a new trial on this basis requires a finding that the trial court abused its discretion.[31] Unlike the review of a jnov motion, the trial court must weigh the evidence and the credibility of the witnesses to determine whether a manifest injustice has been done.[32] "Where a jury verdict is supported by substantial competent, credible evidence, it is an abuse of discretion to grant a motion for a new trial."[33] We have already addressed our standard of review for a denial of a jnov motion under Marx's first assignment. Because Marx's claim that attorney fees should not have been awarded is dependent on his punitive-damages argument,[34] we focus our analysis on the punitive-damages issue.

To be awarded punitive damages above and beyond compensatory damages, a plaintiff must show that the defendant's acts reflected "malice, aggravated or egregious fraud, oppression, or insult."[35] Meyers argues that a showing of insult in and of itself is sufficient to justify punitive damages. Marx argues that Meyers failed to demonstrate that he could have foreseen that his conduct had a great probability of causing substantial harm.

It is the egregiousness of the defendant's conduct that determines the appropriateness of an award of punitive damages. In Ohio, egregiousness is defined by the defendant's evil or depraved mental state or his willingness to disregard almost certain injury. We call this "actual malice." " 'Actual malice'

---

**30.** See *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685.

**31.** *Id.*, paragraph one of the syllabus.

**32.** *Id.* at 92, 262 N.E.2d at 691.

**33.** *Hancock v. Norfolk & W. Ry. Co.* (1987), 39 Ohio App.3d 77, 81, 529 N.E.2d 937, 942.

**34.** See *Columbus Fin., Inc. v. Howard* (1975), 42 Ohio St.2d 178, 183, 71 O.O.2d 174, 176–177, 327 N.E.2d 654, 658.

**35.** R.C. 2315.21(B).

for these purposes is '(1) that state of mind under which a person's conduct is characterized by hatred, ill will, or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.' " [36] The first prong of actual malice has also been defined as conduct characterized by "retaliation, or a determination to vent * * * feelings upon other persons." [37] Because a defendant would scarcely admit he has acted with actual malice, it may be inferred from conduct and surrounding circumstances that may be characterized as reckless, wanton, willful, or gross. [38]

 Upon being questioned about his limited menu and hearing Meyers's preference for a competitor, Marx verbally attacked her in front of other customers about her sexuality. He continued the attack after being informed that his behavior was humiliating her. There was also evidence that he angrily walked past her house after the incident. A jury could have reasonably concluded that Marx's insulting conduct resulted from the first prong of actual malice—a mental state characterized by hatred or ill will or revenge as a result of her expressed preference for a competitor. We conclude that the evidence presented was sufficient to warrant the denial of Marx's motions. We overrule Marx's second assignment of error.

### E. Alleged Misconduct of Meyers's Counsel

 In his third assignment, Marx claims that the trial court erred in not granting his motion for a mistrial or for a new trial. Obviously this claim was based on Civ.R. 59(A)(2) misconduct of the prevailing party. Whether to deny a motion for a new trial upon this ground rests within the sound discretion of the trial court. [39] The same discretion is afforded to a ruling on a motion for a mistrial. [40]

In this case, Marx filed a motion *in limine* to preclude alleged statements of Marx not heard by Meyers but related to her by witnesses other than Marx's employees. The trial court granted the motion. At issue is a statement allegedly made by Marx in Clark's presence that "women are only good for fucking." In her deposition, Meyers said Clark told her that after Meyers told Marx she

---

**36.** *Calmes v. Goodyear Tire & Rubber Co.* (1991), 61 Ohio St.3d 470, 473, 575 N.E.2d 416, 419, quoting *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus.

**37.** *Columbus Fin. v. Howard, supra.*

**38.** *Detling v. Chockley* (1982), 70 Ohio St.2d 134, 136, 24 O.O.3d 239, 241, 436 N.E.2d 208, 209–210, overruled on other grounds in *Cabe v. Lunich* (1994), 70 Ohio St.3d 598, 640 N.E.2d 159.

**39.** *Dawson v. MetroHealth Ctr.* (1995), 104 Ohio App.3d 654, 662 N.E.2d 1123.

**40.** *Tracy v. Merrell Dow Pharmaceuticals, Inc.* (1991), 58 Ohio St.3d 147, 569 N.E.2d 875.

deserved an apology, Marx got on his knee and sarcastically said he was sorry for saying that all women were "only good for fucking." Meyers did not hear the comment or see the "apology." In his deposition, Clark testified that Marx made the comment once during his verbal assault on Meyers and again after Meyers said she deserved an apology. At that time, Marx got on his knees and said, "I'm sorry I said that women are only good for fucking."

During his opening statement, Meyers's counsel stated that Marx had said, "Women are only good for fucking." Marx's counsel objected and the trial court sustained the objection after an unrecorded sidebar. The trial court told the jury to disregard the statement and ordered it stricken from the record. During his testimony, Clark started to relate what he heard Marx say to Meyers. Another unrecorded sidebar took place, and the court asked Meyers's counsel to speak with the witness outside the jury's hearing, which he did. Clark then testified as to what he heard and included the statement that "women are only good for fucking" as one of three comments Marx made to Meyers. No objection was made. Shortly thereafter, Clark said, "And due to this ruling, I don't know where I'm supposed to go from here." During his closing argument Meyers's counsel stated that there was no warning sign at Marx's store saying, "Beware, owner may say something to your wife or to your daughter or to you, are you fucking the guy that you're with, and you got a nice ass, and, you know, women are only good for fucking." Marx's counsel objected. The trial court overruled the objection.

When Marx moved for a mistrial, Meyers's counsel argued that the ruling on the motion *in limine* applied only to the statement when it was offered by Marx in his apology. The trial court stated, "That's correct."

Although the trial court stated in a *nunc pro tunc* order regarding the motion *in limine* that its pretrial ruling had precluded the use of "any statement concerning 'women are only good for fucking,' " the record indicates that, at the time references were made to the statements, an element of confusion existed as to whether both the apology for saying women were "only good for fucking" and the original statement itself were precluded by the court's pretrial ruling. The statement, as it was included as part of the apology, was never put before the jury.

The jury received instructions during the opening argument to disregard the statement. It also received an instruction at the end of all the evidence to disregard stricken statements, as well as an admonition that opening statements and oral arguments were not to be considered as evidence. Juries are presumed to follow the court's instructions.[41] The trial court was in the best position to

---

41. *State v. Franklin* (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1, 9.

assess whether counsel's conduct was intentional and what impact it had on the jury. In light of the evidence before the jury and the instructions provided, we conclude that the trial court did not abuse its discretion in denying Marx's motions. We overrule Marx's third assignment.

### F. No Passion and Prejudice

In his fourth assignment of error, Marx argues that the trial court erred in failing to hold that the punitive-damage award was excessive. He contends that the award was the result of passion and prejudice engendered by the breach of the ruling *in limine* and the introduction of a letter written by Dr. Myszak.

 The purpose of punitive damages is to punish and to deter certain conduct. "If the punitive damages award is not the result of passion and prejudice, and not the result of legal error, it is generally not within the province of a reviewing court to substitute its view for that of the jury." [42] It is our duty to ascertain whether the record demonstrates that the award was induced by any action occurring at trial that could have swayed the jury to assess damages in a particular amount.[43] We have already addressed the conduct at issue in our discussion of Marx's motion in limine.

Marx also contends that the trial court erred in admitting a psychological report prepared by Myszak. Myszak prepared the report at the request of Meyers's counsel. Myszak identified it as written by her. Meyers's counsel invited her to refer to the report anytime she needed to do so. Marx's counsel had the opportunity to cross-examine her on information in the report.

 While trial courts normally have broad discretion in admitting evidence, Evid.R. 802 specifically states that hearsay is inadmissible. "This rule does not provide the trial court with discretion to admit hearsay; rather, the rule mandates its exclusion unless the exceptions found at Evid.R. 803, 804, or 807 apply. Unlike those evidentiary rulings which relate to matters either explicitly or implicitly within the trial court's discretion, the admissibility of hearsay should be reviewed with little deference to the trial court's decision." [44] Consequently, "errors relating to the trial court's admission of hearsay must be reviewed in light of Evid.R. 103(A) and the standard established in Crim.R. 52(A), which provides

---

42. *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 480, 700 N.E.2d 859, 871.

43. *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 543 N.E.2d 464, overruled on other grounds in *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 635 N.E.2d 331.

44. *Smith v. Seitz* (July 9, 1998), Vinton App. No. 97CA515, unreported, 1998 WL 393880, citing *State v. Sorrels* (1991), 71 Ohio App.3d 162, 165, 593 N.E.2d 313, 314–315.

that such errors are harmless unless the record demonstrates that the errors affected a party's substantial right."[45]

We agree with Marx that the report was not admissible as a business record under Evid.R. 803(6). No foundation was laid demonstrating that the report was prepared at or near the time of the recorded event or that it was the regular custom to make such a report. In fact, the record demonstrates that the report was made at the behest of Meyers's attorney. Further, the report contains a diagnosis, and Evid.R. 803(6) does not allow for opinions and diagnoses found in business records to be admitted into evidence. We also conclude that the summary was inadmissible as a diagnosis under R.C. 2317.40 because no foundation was laid to show that the summary constituted a systematic entry made in the regular course of Myszak's business.[46]

While Evid.R. 801(D)(1)(b) identifies various statements that are not considered hearsay, including prior consistent statements of a testifying witness, the report does not fall within this provision because it was not offered to rebut a charge of improper influence or recent fabrication. Thus, we conclude that because the report was hearsay and did not fall within any exception to permit its admission, the trial court erred in admitting it.

We must next determine whether the admission of the report adversely affected any substantial rights of Marx.[47] In this case, the information contained in the report was presented to the jury through the testimony of the witnesses, including Dr. Myszak. Marx's counsel had the opportunity to cross-examine the witnesses and effectively did so. We conclude that the admission of the report was harmless. We overrule Marx's fourth assignment of error.

### G. Reasonableness of Fees Not Challenged.

In his fifth assignment of error, Marx argues that the trial court erred in not granting his request for oral argument on the issue of attorney fees. He contends, as he did in his postjudgment motions, that he was entitled to a hearing under Loc.R. 14(C) of the Hamilton County Court of Common Pleas, to contest the reasonableness of the fees sought by opposing counsel. Marx's initial request for an oral hearing, however, was not made to challenge the reasonableness of the

---

45. *State v. Sorrels, supra,* at 165, 593 N.E.2d at 315.

46. See *Hytha v. Schwendeman* (1974), 40 Ohio App.2d 478, 69 O.O.2d 419, 320 N.E.2d 312.

47. See *Brooks v. Bell* (Apr. 10, 1998), Hamilton App. No. C–970548, unreported, 1998 WL 165024; *Gallimore v. Children's Hosp. Med. Ctr.* (Feb. 26, 1992), Hamilton App. No. C–890808, unreported, 1992 WL 37742, affirmed (1993), 67 Ohio St.3d 244, 617 N.E.2d 1052; Evid.R. 103(A).

fees, but to dispute Meyers's underlying entitlement to the fees. Meyers's request for fees, filed after the trial in which the jury had determined that Marx was liable for attorney fees, contained an affidavit of the hourly charges for each attorney and a detailed printout of the hours expended. Marx's memorandum in opposition contested only the *entitlement* to fees, not their reasonableness. The time to contest the reasonableness of fees was when the affidavit was submitted. Then, the trial court could have scheduled an evidentiary hearing on the reasonableness of the requested fees.

The trial court's memorandum of decision specifically explains:

"The one issue raised by the defendant is whether the plaintiff is entitled to attorneys' fees. On that issue, the research and arguments of the defendants miss the point. Contrary to the defendants' position, the plaintiff was not required to show a threat of physical harm or accompanying physical harm in order to establish intentional infliction of emotional distress. The defendants appear to confuse the law as it pertains to intentional infliction of emotional distress with the law of negligent infliction of emotional distress. There is a critical difference that the defendants have not yet grasped.

"The Court finds that the punitive damages were properly awarded under the facts of this case. Since punitive damages were properly awarded, the law permits an award of attorney fees even when no statutory authority for the same exists.

"Since the defendants have presented no evidence to the contrary and because this Court has reviewed the affidavit of fees and expenses and finds them to be reasonable, this Court hereby awards to the plaintiff the sum of $22,171.25 plus $1345.10 and as for attorneys' fees and associated costs." (Citations omitted.)

Loc.R. 14(C)(2) states that the trial court has discretion either to decide an issue in a civil matter or to set the matter for oral argument. Further, a court is not required to hold an evidentiary hearing before awarding attorney fees unless a party seeks the fees as a sanction for frivolous conduct under R.C. 2323.51.[48]

The determination of the amount of attorney fees to be awarded in this case was a matter within the discretion of the trial court.[49] The record contains evidence of the "actual value of the services performed, the time spent by the attorneys, and the reasonable value of that time."[50] Based on the

---

48. *Okocha v. Fehrenbacher* (1995), 101 Ohio App.3d 309, 655 N.E.2d 744.

49. *Id.* at 321, 655 N.E.2d at 752.

50. *Id.* at 321–322, 655 N.E.2d at 752.

evidence the trial court considered in determining the amount of the fee award, we conclude that the trial court did not abuse its discretion in its determination of fees. We overrule Marx's last assignment of error.

### III. MEYERS'S CROSS–APPEAL

In her cross-appeal, Meyers argues that the trial court erred in granting summary judgment to Marx on her claim of discrimination under R.C. 4112.02(G). R.C. 4112.02(G) prohibits any proprietor of a place of public accommodation from denying "to any person, except for reasons applicable alike to all persons regardless of race, color, religion, sex, national origin, handicap, age, or ancestry, the full enjoyment of the accommodations, advantages, facilities, or privileges of the place of public accommodation." The purpose of the statute is to eradicate illegal discrimination in places of public accommodation so that full enjoyment is available to all.[51] The thrust of the statute, by its terms, is the comparability of treatment. Any denial of enjoyment of services must be applicable to all persons.

The evidence before the trial court consisted of Meyers's and Clark's descriptions of what had occurred between Meyers and Marx, Meyers's testimony that she believed the comments were gender-driven and that she was offended, and Meyers's testimony concerning second- and third-hand allegations made by other women about how Marx had made them uncomfortable. The evidence before the trial court also included Marx's testimony that he had never made such comments, as well as the testimony of others that they had never heard him make such comments to Meyers or to other customers. Marx did admit that he had been described as loud and obnoxious by customers. A male employee testified that Marx called him stupid in a bantering manner.

Meyers testified that Marx had a wall of photographs in his store in which he turned upside down the photographs of people he considered "losers." Meyers also testified that Marx was hostile, aggressive, and rude to the male employee and to Clark. Clark testified that Marx had asked him if he was "fucking" Meyers.

There is no dispute that Marx provided Meyers with the services she had requested, allowed her to eat at the store, and provided her a place to sit. There is also no dispute that Marx's store constituted a place of public accommodation.

What is at issue in this case is what constitutes "full enjoyment of the accommodations, advantages, facilities, or privileges" of a place of public accommodation and whether Marx treated Meyers, because of her gender, in a manner

---

51. See *Ohio Civ. Rights Comm. v. Lysyj* (1974), 38 Ohio St.2d 217, 67 O.O.2d 287, 313 N.E.2d 3.

that differed from his treatment of others in his store. "Full enjoyment of accommodations, advantages, facilities, or privileges" is not defined by statute. We have found only one Ohio case that even implies what the phrase means. That case discusses the statute in terms of "denial of services" or "the treatment accorded" a customer.[52]

We believe "full enjoyment" of the accommodations, facilities, advantages, or privileges of a place of public accommodations means the right to purchase all services or products of a place of public accommodation, the right to be admitted to any place of public accommodation, and the right to have access to the services and products of such a place in the same manner as all other customers. In this case, Meyers was admitted, was served, and was provided access to the same services as any other customer.

Even had she not been provided the same full enjoyment of the services of the restaurant, Meyers failed to demonstrate that Marx's treatment of her was specifically gender-based. The record reflects that Marx treated his customers and employees with disrespect regardless of gender. Meyers admitted that Marx was hostile and aggressive to another male customer and a male employee. Marx agreed that customers called him loud and obnoxious. Marx made inappropriate comments to Clark as well. While we do not condone Marx's comments to Meyers, we do not believe that the trial court erred in ruling, as a matter of law, that they did not give rise to actionable discrimination in public accommodations. We overrule Meyers's only assignment of error.

Accordingly, we affirm the judgment of the trial court.

*Judgment affirmed.*

SUNDERMANN, P.J., concurs.

GORMAN, J., concurs in part and dissents in part.

GORMAN, Judge, concurring in part and dissenting in part.

With respect to the majority's resolution of Marx's fifth assignment of error challenging the denial of his request for a hearing on the amount of attorney fees awarded, I dissent. This issue was not waived as the majority holds.

In *Digital & Analog Corp. v. N. Sup. Co.*,[53] the Supreme Court in unequivocal terms adopted the procedure for assessment and determination of attorney fees when a jury awards punitive damages in a tort action. "[T]he amount of attorney

---

52. See *Love v. Ohio Civ. Rights Comm.* (July 19, 1983), Stark App. No. 6072, unreported, 1983 WL 6548.

53. (1992), 63 Ohio St.3d 657, 590 N.E.2d 737.

fees to be awarded in a tort action, after a jury determination that a defendant is liable for such fees, will lie in the sound discretion of the trial judge, based upon evidence that the defendant has been given the opportunity to present either at a post-trial hearing or at trial." [54] In *Zoppo v. Homestead Ins. Co.,*[55] the Supreme Court expressly reaffirmed the procedure for assessment of attorney fees announced in *Digital* despite its holding that the legislative scheme for determination of punitive damages by the judge under R.C. 2315.21(C)(2) violates the right to trial by jury.

At the second stage of the bifurcated proceeding, in compliance with *Digital,* the trial court was to determine the amount of Meyers's attorney fees. At this second stage, it was incumbent upon the trial court to provide Marx an opportunity to challenge the affidavits that Meyers offered in support of her post-trial motion requesting attorney fees in the sum of $21,458.75 and $1,345.10 in costs. Marx appropriately notified the trial court by a memorandum that he was challenging Meyers's entitlement to attorney fees and requested oral argument. In response, however, the trial court stated, "The Court finds that the request for an oral hearing is not necessary since the defendants have failed to raise any specific objection as to hours expended or hourly rate charged by the plaintiffs' counsel. The affidavits of the plaintiff remain unrebutted and therefore no hearing is necessary."

By summarily preempting a hearing, the trial court deprived Marx of the opportunity to challenge the amount of attorney fees. Although the evidentiary hearing need not be conducted in open court, at the very least, under *Digital* the trial court must demonstrate in the record that it provided Marx some forum, if only by means of deposition or affidavit, to offer expert evidence on the issue of reasonableness. Here, the record is silent. For the trial court to proceed to assess attorney fees on a waiver theory ignores the mandate of *Digital* and the rule of fairness.

I join the majority in overruling the other assignments of error.

---

54. *Id.* at 664, 590 N.E.2d at 743.

55. (1994), 71 Ohio St.3d 552, 557, 644 N.E.2d 397, 401.