[Cite as *Gilliland v. Adams*, 2023-Ohio-3083.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| JA-NELLE GILLILAND | : | |
| | : | |
| Appellant | : | C.A. No. 29732 |
| | : | |
| v. | : | Trial Court Case No. 2022 CV 00845 |
| | : | |
| MARK R. ADAMS | : | (Civil Appeal from Common Pleas |
| | : | Court) |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on September 1, 2023

. . . . . . . . . . .

DWIGHT D. BRANNON & KEVIN A. BOWMAN, Attorneys for Appellant

DEREK L. MUNCY, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Plaintiff-Appellant Ja-Nelle Gilliland appeals from the trial court's order granting Defendant-Appellee Mark R. Adams's motion for summary judgment. For the reasons that follow, the judgment of the trial court will be reversed, and the case will be remanded for further proceedings in accordance with this opinion.

## I.       Facts and Procedural History

{¶ 2} In most appeals, we can make a single chronicle of what transpired. If the case is a plea, the defendant-appellant admits to the facts set forth by the State. In a trial, the testimony tells the story. In this case, though, the parties, while they shared a similar timeline of events, told completely different narratives. Because of that, the facts adduced come from the parties' respective depositions.

Gilliland's Story

{¶ 3} In 2018, Gilliland was the owner of Rogue Salon in Clayton. On November 9, 2018, she went into the PNC Bank location in Englewood and met with Adams to change the name on her business account from her name to that of her salon. Even though Gilliland was not in the market for it, she asserted that she completed paperwork for a new business credit card. Gilliland was also informed by Adams that some of her documents were incorrect and she would need to come back to make changes. A new appointment was set for November 14 but was cancelled due to inclement weather.

{¶ 4} On December 7, 2018, Gilliland and her husband were preparing for an open house at the new Clayton salon when Adams unexpectedly arrived for a visit. Once inside, he asked to speak to Gilliland privately. Adams revealed to Gilliland that he had secured some grants and investors for her business, a credit card, and a small business loan with "excellent interest." Only a few days later, though, the business fell through and the salon never opened. A bankruptcy filing followed.

{¶ 5} After failing to open the salon in Clayton, Gilliland called Adams to explain the circumstances and was told that they could "pause" everything until a new location

was found. In late April 2019, Gilliland found a space in Piqua to potentially re-launch Rogue Salon, and she contacted Adams to see if he could still help her with the financing. He assured her that he could, and the two planned to meet at the bank on the morning of May 13, 2019.

{¶ 6} According to Gilliland, when she arrived at the meeting, Adams began bragging about his political connections and stated that he had done undercover work with the Montgomery County Sheriff's Office to take down a sex trafficking ring. The conversation turned political, and Adams made the comment that Gilliland was "just Trump's type." She laughed it off and said, "yeah, maybe 65 pounds ago and twenty some odd years ago." Gilliland Deposition at 48. Gilliland then made it clear that she believed the conversation was inappropriate. Also at this meeting, Adams informed her that he had secured for her a $10,000 small business loan, a $5,000 credit card, and a $25,000 grant from PNC for women-owned businesses. He also allegedly set up a "Clover Flex" point of sale system and collected $498 to do so. An additional meeting was scheduled on May 17 for Gilliland to finalize the requisite documentation.

{¶ 7} On May 16, Gilliland and Adams exchanged a series of text messages. The messages began with Adams advising Gilliland on where to find some required documents online. Then, around 4:48 p.m., Gilliland inadvertently sent a selfie to Adams. She apologized and explained it was supposed to be sent to one of her friends. Adams responded: "Damn, nice. Beautiful. Lol." He later added: "No need to be sorry, as long as you don't mind me enjoying it." The text conversation then returned to what was needed to open an account; Gilliland emphasized that she did not want a loan or credit card.

{¶ 8} The following day, Gilliland was scheduled to meet with Adams again to set up her business account. Prior to the meeting, though, Adams informed her that there was a $100 fee to open the account. Gilliland noted that she only had $40 and needed that to feed her children. Adams agreed to waive most of the fee and do it for $25. She also testified that she brought $1,566 to deposit in her business account for rent, but the money never made it into her account.

{¶ 9} Gilliland stated that once she was in Adams's office, he led them into a conversation about politics and abortion which made her uncomfortable. She became even more uncomfortable when the conversation turned to sex. Adams allegedly told her that he had recently been at a training seminar and all he could think about was "how he did not put [her] over his desk when he had the chance." Gilliland Deposition at 68. She believed this to be a clear indication that he wanted to have sex with her. She further testified that Adams told her: "My wife and I haven't had sex in well over 12 years. I'm coming to you as a new man. * * * I'll take care of you." Gilliland Deposition at 69. At one point during their meeting that day, Gilliland got up to go to the bathroom, and as Adams escorted her out of his office, he put his hand on the small of her back.

{¶ 10} After the meeting ended, the two exchanged more texts, including the following exchange.

Gilliland:     Soooo. I think you want something.

Adams:     Yes, you are right. But, I also respect you. I am not one of the guys.

Adams:     We need to talk.

Adams:     I will explain.

Adams:     What do you want, that's important to me.

Gilliland:     I want someone that can help me in many ways. I think you know this. I want in politics, you want me red[.] [S]how me why I should be, I'm pretty open minded. I won't be controlled, that's for sure. I have my tattoos and wild hair doesn't mean I'm wild. You know I need someone that can help me literally right now. Ball is in your court.

Gilliland:     Balls only in your court for a limited time.

Adams:     Like I said, we needed to talk. I want a long term relationship with love, caring, respect and excitement. I don't have money available to help you now. I will help you where I can.

Adams:     I am not one of the other guys.

Gilliland:     I'm not saying you are.

Gilliland:     I'm saying I need help. If your [sic] not willing that's fine.

Gilliland:     But I'm not a hooker.

Gilliland:     See the others want me to commit to them and commit my body to them but that it. If I'm doing this I want proof that there is something in it for me other than promises.

Gilliland:     So you are a banker you know how zelle works you only need my name and phone number or name and email. Prove to me you are serious and it has to be substantial.

Gilliland:     You have until about 3:30 to make up your mind. If not it will never be talked about again or revisited.

Gilliland:    So you mislead [sic] me. So you are like the other guys.

Gilliland:    So basically had I took your advances you made in your office I would have gotten my loan that I wanted. Good to know you had other intentions.

Adams:    I will still try to get you a loan. I have not made advances. I told you I was not going to try to have sex with you. I will try to help you any way possible. I do not come close to thinking you are a hooker.

Adams:    You are bright, energetic and a good person.

{¶ 11} On May 18, 2019, Gilliland went to Adams's superiors and accused him of sexual harassment.

Adams's Story

{¶ 12} Mark Adams had worked for PNC Bank for 13 years and was the vice president of the Englewood branch when Gilliland came into his office in November 2018. According to Adams, the sole reason for her visit was to change the name on her checking account; she was not interested in a loan or merchant services for the hair salon she was trying to open. However, because of pressure from "higher ups" to get business and corporate accounts, Adams explained to Gilliland about the other services PNC could offer her fledgling venture.

{¶ 13} During their early conversations, Gilliland revealed that she had come to the Englewood PNC branch because the manager of another branch propositioned her. According to the story, the manager from a northern branch told her that, despite having bad credit, he would get her a loan in return for sexual favors. Adams did not believe the story and considered it to be a red flag, but because he wanted Gilliland's business,

Adams still tried to help. "I had gotten the distinct impression that there was more going on than just the business to start her salon." Adams Deposition at 20.

{¶ 14} During on-going discussions, "it became very obvious that she was – had other things in mind other than getting business with PNC." Adams Deposition at 16. According to Adams, Gilliland began to tell him that she had five men who would give her money in exchange for sex. She called them her "other guys." She made other sexual comments as well, and Adams believed that she wanted sex. One story she told was that one of her "guys" wanted to "lean her over his desk." Adams made it clear that he was not "one of her guys" and was not interested in having sex. Nevertheless, for the next several months, Adams continued to pursue Gilliland's business and spoke to her via phone and text intermittently. According to Adams, she also would stop in his office from time to time.

{¶ 15} Adams found some of the conversations in which Gilliland engaged to be odd. For instance, "there was one point she asked me about me being in politics. And that she would * * * 'think about going red' and if she – you know, needed help and I said 'well, if you really want to, you know, I can see if I can get somebody who needs some help passing out literature.' " Adams Deposition at 66. She also, according to Adams, mentioned that she had met Donald Trump, and he had told her that she was just his type if she would lose 25 pounds. Gilliland also mentioned that she was a "Me Too" activist.

{¶ 16} The two scheduled a meeting on May 17, 2019, to set up a PNC business checking account. On May 16, they exchanged several texts messages in which Adams explained what paperwork Gilliland would need to open an account. In the midst of that

conversation, Gilliland sent Adams a selfie taken from an angle that accentuated her breasts. She claimed that it was sent by mistake and was actually intended for her friend, Tarah. Adams, for his part, responded, "Damn, nice. Beautiful. Lol."

**{¶ 17}** On May 17, 2019, Gilliland met with Adams in his office at the bank. However, before she arrived, the two were in contact via text. Gilliland informed Adams that she did not have enough money to set up an account. "Well, I only have 45 [dollars] to my name and I need that for groceries so I think I will have to take up one of the offers I have been offered." Adams interpreted the talk of "offers" as referring to one of the men she had previously mentioned who would give her money in exchange for sex. He replied that he would open up an account for only $25.

**{¶ 18}** Gilliland arrived at the end of the business day on May 17. Adams stated that there had been other employees still at the bank because it was company policy that, even if the bank had closed, everyone had to stay if there was a customer around. During the visit, he was able to help Gilliland open a business checking account, and she left happy. Shortly afterwards, her attitude totally changed.

**{¶ 19}** The following day Adams went to his bosses to inform them of the situation. According to him, the ensuing investigation found that he may have used some "verbiage" that he should not have and, to ensure the bank did not experience any bad press, he was terminated from his position. He was, however, given his full retirement benefits and was permitted to tell the public that he had retired.

Procedural Posture

**{¶ 20}** Gilliland's original complaint was filed July 31, 2020, but was voluntarily

dismissed on November 16, 2021, after Adams filed a motion to dismiss for failure to prosecute. The new complaint, which included claims of intentional infliction of emotional distress and unlawful discrimination on the basis of sex under R.C. 4112.02(G), was filed on February 25, 2022. Adams filed a motion for summary judgment on November 23, 2022. After Gilliland filed her motion in opposition, the trial court granted Adams's motion, finding that Gilliland "failed to show a genuine issue of material fact precluding summary judgment on her R.C. 4112.02(G) claim." The court likewise granted summary judgment in Adams's favor on the intentional infliction of emotional distress claim.

{¶ 21} Gilliland has appealed the trial court's summary judgment decision as to the R.C. 4112.02(G) claim only.

## II.     Summary Judgment

{¶ 22} In her assignment of error, Gilliland argues that the trial court erred by granting summary judgment in favor of Adams on her claim of sex discrimination under R.C. 4112.02(G).

{¶ 23} Pursuant to Civ.R. 56(C), a movant is entitled to summary judgment when that party demonstrates that there is (1) no issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to only one conclusion, and that conclusion is adverse to the non-moving party. *Rhododendron Holdings, LLC v. Harris*, 2021-Ohio-147, 166 N.E.3d 725, ¶ 22 (2d Dist.).

{¶ 24} "The burden of demonstrating that no genuine issues exist as to any material fact falls upon the moving party requesting a summary judgment." *Harless v. Willis Day Warehousing Co., Inc.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978). Once the

moving party has satisfied its burden of showing that there is no genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a genuine issue for trial. *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). The nonmoving party cannot rely upon the mere allegations or denials in the pleadings, but must give specific facts showing that there is a genuine issue for trial. Civ.R. 56(E). *Accord Geloff v. R.C. Hemm's Glass Shops, Inc.*, 2021-Ohio-394, 167 N.E.3d 1095, ¶ 14 (2d Dist.). When the standard is met, summary judgment must be awarded as a matter of law. We review the trial court's ruling on a summary judgment motion de novo. *Martcheva v. Dayton Bd. of Edn.,* 2021-Ohio-3524, 179 N.E.3d 687, ¶ 35 (2d Dist.).

**{¶ 25}** As to the substantive claim, R.C. 4112.02(G) states that it is an unlawful discriminatory practice "[f]or any proprietor or any employee, keeper, or manager of a place of public accommodation to deny to any person, except for reasons applicable alike to all persons regardless of race, color, religion, sex, military status, national origin, disability, age, or ancestry, the full enjoyment of the accommodations, advantages, facilities, or privileges of the place of public accommodation."

**{¶ 26}** Discrimination can come in different forms, but in this case, Gilliland's theory was that it was quid pro quo sexual harassment. This type of harassment (which is most commonly seen in the employment context) can be proven by demonstrating (1) that the victim was a member of a protected class, (2) that the victim was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors, (3) that the harassment complained of was based on gender, and (4) that the submission to the unwelcome advances was an express or implied condition for receiving benefits or that

the refusal to submit to the sexual demands resulted in a tangible detriment. *Kinnison v. Advance Stores Co.*, 5th Dist. Richland No. 02CA73, 2003-Ohio-3387, ¶ 14.

{¶ 27} According to the Ohio Supreme Court, the test for unlawful discrimination under R.C. 4112.02(G) "is simply whether the proprietor, keeper, manager, or employee of a place of public accommodation has **denied to any person the full enjoyment** of such place **for reasons not applicable alike to all persons** irrespective of race, color, religion, [**sex**, military status] national origin, [disability, age,] or ancestry." (Emphasis sic.) *Ohio Civil Rights Comm. v. Lysyj*, 38 Ohio St.2d 217, 221, 313 N.E.2d 3 (1974) (bracketed terms are now part of the statute).

{¶ 28} Even though the Court set forth the test, there was no definition given (either by the Court or the statute) for the key phrase "full enjoyment" of accommodations, advantages, facilities, or privileges. Since the 1970s, though, Ohio appellate courts have adopted a uniform definition. "Full enjoyment" of a public place of accommodation means "the right to purchase all services or products of a place of accommodation, the right to be admitted to any place of accommodation, and the right to have access to the services and products of such a place in the same manner as all other customers." *Meyers v. Hot Bagels Factory, Inc.*, 131 Ohio App.3d 82, 104, 721 N.E.2d 1068 (1st. Dist.1999). A bank is a place of public accommodation. *Love v. Ohio Civil Rights Comm.*, 5th Dist. Stark No. 6072, 1983 WL 6548, *2 (July 19, 1983).

{¶ 29} The outcome of this case turns on this question: Was there something offered to the public that Gilliland did not get because she rebuked Adams's purported sexual advancements? Adams argues that "other than her own self-serving statements

of feeling 'embarrassed' and 'belittled' by Mr. Adams, [Gilliland] is unable to point to any set of facts establishing how she was denied full enjoyment of the accommodations, advantages, facilities, or privileges of PNC Bank." Appellee's Brief at 11.

**{¶ 30}** While it is true that the record contains no physical evidence (i.e., a paper trail) that Gilliland applied for a loan or a small business credit card, there is still *some* evidence (albeit contradictory to other pieces of evidence, and sometimes contradictory to her own words) that Gilliland asked for a loan but did not receive one. For instance, Gilliland testified that at some point she did fill out loan paperwork. Gilliland Deposition at 12. During a text exchange she also stated that "I was very up front that I wanted a loan. [But] I was not going to sleep with him or anyone else to make that happen. * * * Not once did I even hint at possibly being interested in anything but a loan." May 18, 2019, Text Message.

**{¶ 31}** Despite the trial court's ruling to the contrary, and Adam's contention that the statements were "self-serving," we believe Gilliland's declarations that she wanted a loan were sufficient to survive this stage of the litigation. Civ.R. 56(C) permits the use of depositions to support summary judgment. The party opposing the motion may use any material contemplated by the Rule to "set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E). At trial, the fact finder may not believe Gilliland – and Adams can certainly use her seemingly contradictory statements against her – but the statements that she did want a loan raised an issue of material fact that should be decided at trial, not on summary judgment. Gilliland's assignment of error is sustained.

### III.    Conclusion

**{¶ 32}** Because we conclude that there was a genuine issue of material fact as to whether Gilliland was denied the full enjoyment of PNC Bank as a result of sexual harassment, the judgment of the trial court will be reversed, and the matter will be remanded the case for further proceedings in accordance with this opinion.

. . . . . . . . . . . . .

WELBAUM, P.J. and LEWIS, J., concur.