.Edward GREENWOOD,
et al., Plaintiffs,

v.

DELPHI AUTOMOTIVE SYSTEMS INC., et al., Defendants.

No. C–3–00–384.

United States District Court,
S.D. Ohio,
Western Division.

March 17, 2003.

Thomas Albert Hansen, Breidenbach, Johnson, Douple, Beyoglides, Leve & Hansen, Dayton, OH, for plaintiffs/counter-defendant.

Lori A. Clary, Jones Day Reavis & Pogue, Columbus, OH, Robert S. Walker, Tracy K. Stratford, Jones, Day, Reavis, & Pogue, Cleveland, OH, Thomas J. Replogle, Gianuglou, Skilken & Replogle, Dayton, OH, Stephen Koslow, Washington, DC, Thomas Hays Pyper, Jenks Pyper & Oxley Co LPA, Dayton, OH, for defendants/counter-claimant.

DECISION AND ENTRY SUSTAINING THE MOTIONS OF CRYSTAL LONG AND TERI ENGLEMAN FOR SUMMARY JUDGMENT (DOC. # 52); OF DELPHI AUTOMOTIVE SYSTEMS, INC., FOR SUMMARY JUDGMENT (DOC. # 53), AND OF IUE LOCAL 755, DAVID HEIZER, GERALD SEEGE, EDWARD HARM AND JAMES CLARK FOR SUMMARY JUDGMENT (DOC. # 55); PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. # 67) SUSTAINED; JUDGMENT TO BE ENTERED ACCORDINGLY; TERMINATION ENTRY

RICE, Chief Judge.

This litigation arises out of the alleged sexual harassment, harassment, and intimidation of Plaintiff Edward J. Greenwood ("Greenwood"), an employee of Defendant Delphi Automotive Systems, Inc. ("Delphi"), by two of his co-workers, Defendants Crystal Long ("Long") and Teri Engleman ("Engleman") (Doc. # 1).[1] In his Complaint, Plaintiff alleges that their conduct was known by Defendant Gerald Seege ("Seege"), an alleged Delphi supervisor,[2] but that no action was taken. Plaintiff further alleges that he filed complaints with his union, Defendant IUE Local 755, but due to the conspiracy between union representatives David Heizer ("Heizer"), Edward Harm ("Harm") and James Clark ("Clark"),[3] his complaints were neither investigated nor addressed.

On June 30, 2000, Plaintiff initiated this litigation in the Montgomery County Court of Common Pleas (Doc. # 1), setting forth four claims for relief, to wit: (1) a state law claim for sexual harassment and hostile work environment, in violation of Ohio Rev.Code Ch. 4112, against Defendants Delphi, Seege, Long and Engleman; (2) a claim against Defendants IUE Local 755, Clark, Heizer and Harm ("the Union Defendants") for breach of their duty of fair representation; (3) a state law claim against Defendants Heizer, Harm, Clark, Seege, Long and Engleman for conspiracy to inflict severe emotional distress; and (4) a state law claim by Plaintiff's wife for loss of consortium. On August 2, 2000, Delphi, with the written consent of the other Defendants, removed the action to this Court, alleging that the claims against the union and its representatives, as set forth in Count Two, are preempted by § 301 of the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 185(a) (*id.*). On August 28, 2000, Long and Engleman filed an Answer and Counterclaim (Doc. # 9), in which they asserted claims of defamation and abuse of process against Greenwood.

Pending before the Court are Defendants' Motions for Summary Judgment, filed by Long and Engleman (Doc. # 52), Delphi (Doc. # 53), and the Union Defendants (Doc. # 55). Also pending is Greenwood's Motion for Summary Judgment on Long and Engleman's counterclaims (Doc. # 67). For the reasons assigned, all of the Motions for Summary Judgment are SUSTAINED.

I. *Standard Governing Summary Judgment Motions*

█ Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the exis-

---

**1.** Plaintiff's wife, Naoka Greenwood, also sets forth a claim for loss of consortium. Hereinafter, the term "Plaintiff" will be used to refer to Edward Greenwood only.

**2.** Mr. Seege was not a Delphi supervisor but, rather, an hourly-paid employee of Delphi and a member of the union. Mr. Seege held the appointed position of Human Relations representative within the union (Seege Depo. at 13; Doc. # 53, Seege Aff. ¶ 2).

**3.** Mr. Clark was Local 755 Shop Chairman (Doc. # 53, Seege Aff. ¶ 2).

tence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991)(The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.")(quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994)("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the factfinder. 10A Wright, Miller & Kane, *Fed-*

*eral Practice and Procedure,* § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment. . . .") Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## II. *Factual Background for Defendants' Motions for Summary Judgment* [4]

Plaintiff Edward Greenwood, a 57 year old male, was hired by Delphi's predecessor, General Motors Corporation, on November 8, 1965, and has worked for the company for more than 37 years. Plaintiff is an hourly employee, and the terms and conditions of his employment are established by collective bargaining agreements between Delphi and his union, Defendant IUE Local 755. For the last fifteen years, Plaintiff has worked in the central tool supply area, commonly referred to as the tool crib, an area where employees request and are provided parts and supplies. Between March of 1998 and March of 1999, Plaintiff worked the third shift.[5] Throughout his employment, he has tried to work as much overtime as possible.

Defendants Crystal Long and Teri Engleman were both hired in the early 1990s, and they became friends.[6] In early 1998, Long began working in the tool crib. Plaintiff and Long briefly worked the same shift. Long introduced Engleman to Plaintiff, and the three of them became friends. For most of the relevant time period, Long and Engleman worked the second shift.

Plaintiff alleges that Long and Engleman have made sexual comments throughout their friendship, beginning in the Spring of 1998. In March of 1998, Engleman and Long commented that Plaintiff had a "cute little butt." (Greenwood Depo.

---

**4.** The following facts are derived from the evidence submitted by the parties regarding Defendants' Motions for Summary Judgment. For purposes of those Motions, the Court will construe the facts and all reasonable inferences in a light most favorable to Plaintiff, the non-moving party. In its substantive analysis, *infra,* the Court will recite additional pertinent facts, again construing those facts and all reasonable inferences most strongly in favor of Plaintiff. The Court acknowledges that Defendants have a dramatically different interpretation of the events leading up to this litigation, including allegations that Greenwood had sexually harassed Long and Engle-

man, and that he began to file complaints after he was rejected by the women.

**5.** Between January of 1998 and December of 2000, the plant operated around-the-clock, utilizing three separate shifts of employees. The first shift worked from 7 a.m. until 3:30 p.m.; the second shift worked from 3:00 p.m. until 11:30 p.m.; and the third shift worked from 11 p.m. until 7:30 a.m. (Heizer Aff. ¶ 4).

**6.** Long was hired by Delphi in February of 1991 (Long Depo. at 5). Engleman began her employment with Delphi on October 19, 1992 (Engleman Depo. at 6).

I at 17)[7]. Plaintiff asserts that, during the Spring and Summer of 1998, Long made other comments of a sexual nature during telephone calls to Plaintiff's home (*id.* at 16). However, Plaintiff was not offended by these comments, and considered them to be more of a joking nature (*id.* 16–18). In May of 1998, Plaintiff had conversations with Engleman about her relationship with her husband (*id.* at 21–22). He indicates that Long had asked him to speak with Engleman about Engleman's alleged affair with another co-worker, because Engleman's husband had threatened to kill her (*id.*).

On approximately July 15, 1998, Plaintiff had lunch at O'Charley's with Engleman, Long, and Debbie Adams, another co-worker. During that lunch, Engleman and Plaintiff went to the foyer to smoke a cigarette, and Engleman put her hand on Plaintiff's leg while telling a story (*id.* at 19). At the time, Plaintiff again did not consider this conduct to be offensive or sexually harassing (*id.*).

During the week of July 27, 1998, Long made a number of telephone calls to Plaintiff at home. In the first conversation, Long discussed Engleman's involvement with other men (*id.* at 27–28). A few days later, Long again called Plaintiff, asking him to assist her in making telephone calls to Engleman's husband and the wife of Engleman's alleged lover (*id.* at 34). Long made other sexual comments, such as "what if I (Long) had you over some night and I had Teri here and she was lying naked on the carpet, what would you do?" (*Id.* at 36–37).

On August 3, 1998, Engleman approached Plaintiff from behind, and began to massage his shoulders while he was sitting at his work station. Plaintiff did not welcome this massage and considered it to be sexual harassment by Engleman. (Greenwood Depo. I at 60–65, Greenwood Depo. II at 13). Long, who was sitting nearby, began to cry, and Engleman responded "Oh, Crystal, you're just jealous." (Greenwood Depo. II at 31). The next day, Engleman was sitting in the crib when Plaintiff returned to his work station from the men's room. Engleman told him, "Crystal is a pretty girl" and left (*id.* at 34). Later that week, Long witnessed Plaintiff talking to another female co-worker (whom he identifies as either Carrie Baker or Shelly Powers) at the crib. (*id.* at 38). After the female co-worker left, Long approached Plaintiff and stood very close to him, causing him to back away. Long took another step forward, and stated, "You're fucking her, aren't you?" (*id.* at 39). Plaintiff responded by explaining to Long that nothing was going to happen between Long and him, and that he would appreciate if she would not talk to him in that manner (*id.* at 40). Long dropped her head and walked off (*id.*) Within a couple of days, Long stated to Plaintiff that he "wouldn't be the first white man I've had sex with." (*id.* at 100). Plaintiff mentioned these incidents to Mike Burton, his third shift supervisor (*id.* at 41–42). However, he did not want to get Long and Engleman in trouble, and he indicated that he wanted to handle it himself (*id.*).

The following week, Plaintiff approached Engleman and asked to speak with her about Long's behavior, as a means of trying to rectify same (*id.* at 43–49). Plaintiff and Engleman got into a crib cart, and Plaintiff drove down to the end of the aisle (*id.* at 45). Plaintiff then told Engleman that Long had become extremely aggressive and blatant, and sought Engleman's help in stopping Long's behavior (*id.* at

7. Plaintiff's deposition was taken over four sessions: March 20, 2001; March 21, 2001; August 7, 2001; and August 8, 2001. The Court will refer to the transcripts of these sessions as Greenwood Depo. I, II, III, and IV, respectively.

45–46). Engleman was not supportive of Plaintiff (*id.* at 46–47). Plaintiff drove back to the crib (*id.* at 47). At this point in time, Plaintiff still wanted to handle the situation himself (*id.* at 49).

Within the next week or two, Engleman's job setter, Mike Simpson, who was standing near the crib, gestured to Plaintiff to come talk with him (*id.* at 54). Mr. Simpson allegedly told Plaintiff that Engleman was upset with Long and with her personal problems, such as her relationship with Larry Cyphers (*id.*) A couple of days later, Engleman stepped in front of Plaintiff's cart as he was making deliveries, and accused him of sharing details of her personal life with Mr. Simpson (*id.* at 60–61). Plaintiff told Engleman that he did not want anything further to do with her (*id.*). He mentioned this conversation with Engleman to Mr. Burton and probably to Mr. Riegle, but he thought the problem had been solved (*id.* at 64). Subsequent to this conversation with Engleman, Plaintiff began to get "dirty looks" from Long. Again, he mentioned Long's behavior to Mr. Burton, but he did not ask management to do anything about the women, because he believed that he had "made his point" with Long and Engleman (*id.* at 71).

In late August, Plaintiff believed that he saw Engleman at a gas station, driving with a man other than her husband (Greenwood Depo. I at 43–45).[8] In order to avoid any embarrassment, Plaintiff pulled out of the gas station and went to a parking lot while waiting for Engleman's truck to leave (*id.*). Due to traffic patterns, Plaintiff could not return to that gas station, and he drove for a short time behind the truck before pulling into another station (*id.*). Plaintiff relayed this event to Long and subsequently to Engleman (*id.* at 45–49). In the beginning of September of 1998, Long visited Plaintiff at the crib and told him that Engleman believed that Plaintiff was stalking her (Engleman) and was going to hurt her or do some kind of harm to her (Greenwood Depo. I at 13; Greenwood Depo. II at 85). Long further related to Plaintiff that Engleman was considering getting the police and her friends involved in the situation (*id.*). Plaintiff immediately went to Mike Burton, and told him what had occurred (Greenwood Depo. I at 14).[9] Plaintiff told Burton that he would not tolerate the threats and accusations, and that he wanted management to make it stop (Greenwood Depo. II at 89). Mr. Burton responded that Greenwood should inform Mr. Bill Riegle (a Delphi supervisor) and his union representative, and to keep him informed (*id.* at 92). Plaintiff contacted Mr. Riegle a few days later, indicating that he wanted the threats and accusations about his alleged stalking to end (*id.* at 93). Mr. Riegle responded that he would be coming to the crib and checking to see if there were any problems (*id.* at 97). After speaking with Riegle, Plaintiff contacted Mr. Steve Elam, his union representative (*id.* at 104).

During the first or second week of September, Long was sitting behind a desk in the crib when she asked Plaintiff to hold out his hand. After Plaintiff showed his hand, Long took a ruler from a drawer and measured his arm from the wrist to the tip, saying "oh, you have a big." (*Id.* at 144). Plaintiff understood that she was referring to the size of his penis (*id.* at 144–45).

---

**8.** It is unclear whether Plaintiff, in fact, saw Engleman or, rather, an individual who resembled Engleman and drove a similar truck.

**9.** Plaintiff indicated that this is the first time that he filed a complaint with anyone at Delphi about Long and Engleman, for the purpose of seeking help from management (Greenwood Depo. at 15).

Subsequent to their initial conversation, Mr. Riegle asked Plaintiff every night how the situation was (*id.* at 97). Mr. Elam also came to crib after Plaintiff's initial conversation with him, at which time Plaintiff informed him that Engleman was making nightly trips to the crib counter, during which she was loud and taunting, and that he considered those trips to be harassment (*id.* at 117, 132). He indicated that a friend of Engleman's, Mr. Jim Morrow, was with her and that he made catcalls toward Plaintiff to harass him (*id.* at 120–22). In response, Plaintiff would call Mr. Burton or Mr. Riegle, who came to the crib (*id.* at 133). After Mr. Burton or Mr. Riegle arrived, Engleman would leave or the comments would stop (*id.* at 133).

On November 10, 1998, Plaintiff was approached by Mr. Gerald Seege, a union representative, who informed him that he was investigating Plaintiff's complaints (*id.* at 204). According to Plaintiff, Seege indicated that a meeting would be held by Ms. Marlane Bengry and Mr. Barry Ray of Delphi Labor Relations with Plaintiff, Long, and Engleman (*id.* at 215). Seege further indicated that he would not be speaking with Plaintiff's witnesses or with Long and Engleman. Plaintiff asserts that he interviewed Long and Engleman's witnesses but not his own, and that Seege spoke with Long and Engleman together, not separately (see *id.* at 231).

On December 10, 1998, the Labor Relations meeting occurred. Plaintiff aired his complaints about Engleman visiting Long at the crib on a nightly basis [10] and about the spreading of rumors by Long and Engleman (*id.* at 251–261). At the conclusion of the meeting, Engleman, Long and Plaintiff agreed to avoid interacting with each other (Seege Aff. ¶ 5). Plaintiff has not complained of further harassment by Long and Engleman since this meeting.

III. *Merits of Defendants' Motions for Summary Judgment (Doc. # 52, Doc. # 53, Dec. # 55)*

In their Motions, Defendants seek summary judgment on each of the claims against them. As a means of analysis, the Court will address the claims in the order they appear in the Complaint.

A. *Individual Liability of Long, Engleman and Seege for Sexual Harassment, Pursuant to Ohio Rev. Code Chapter 4112 (Portion of Count One)*

■ Defendants Long, Engleman and Seege assert that Plaintiff's sexual harassment claims against them in an individual capacity must be dismissed, because they cannot be held liable, as a matter of law. Plaintiff responds that Long and Engleman engaged in sexual harassment and created a sexually hostile work environment. He does not address whether they may be held liable for that alleged conduct.[11] In addition, Plaintiff does not specifically address whether Seege, a Union Defendant, may be held individually liable under Chapter 4112.

Ohio Rev.Code 4112.01(A)(2), defines an "employer" as "the state, any political subdivision of the state, any person employing four or more persons within the state, and any person acting directly or indirectly in

---

**10.** Although Plaintiff and Long worked different shifts, due to the "built-in" overlap of shift schedules and the working of overtime, Plaintiff and Long's work hours overlapped, to a certain extent. Plaintiff complained that Engleman visited Long at the crib during that time period.

**11.** In responding to the Union Defendants' motion for summary judgment on the Chapter 4112 claims, Plaintiff incorporates by reference his response to the Motions of Delphi, Long and Engleman for summary judgment on same (Doc. # 63 at 6).

the interest of an employer." *Id.* In *Genaro v. Cent. Transport, Inc.,* 84 Ohio St.3d 293, 703 N.E.2d 782 (1999), the Ohio Supreme Court held that supervisors and managers may be held individually liable, as "employers," for their own discriminatory conduct. 84 Ohio St.3d 293, 703 N.E.2d 782 (stating that definition of employer under Chapter 4112 was broader than under Title VII). However, Ohio courts have not extended the definition of "employer" to include co-workers and, thus, they have concluded that co-workers may not be held individually liable under Ohio Rev. Ch. 4112. *Hale v. City of Dayton,* 2002 WL 191588 (Ohio App. 2 Dist. Feb. 8, 2002) (firefighter, as a mere co-worker, was not individually liable under Chapter 4112); *Singer v. UAW Local Union 1112,* 2002 WL 818887 (Ohio App. 11th Dist. Apr. 30, 2002) (co-worker could not independently violate Ohio Rev.Code Ch. 4112 "since it does not address discrimination on the part of fellow employees in non-supervisory positions."). Herein, it is undisputed that Long, Engleman and Seege were co-workers who lacked any supervisory authority over Plaintiff. Accordingly, they cannot be held individually liable for their alleged discriminatory conduct, pursuant to Ohio Rev.Code Ch. 4112, as a matter of law. Accordingly, the Motions of Long, Engleman and Seege (the individual Union Defendant) for Summary Judgment on Count One is SUSTAINED.

B. *Sexual Harassment and Hostile Work Environment Claim Against Delphi, Pursuant to Ohio Rev.Code Ch. 4112, Based on the Conduct of Long and Engleman (Portion of Count One)*

Ohio Rev.Code § 4112.02(A) makes it an unlawful discriminatory practice "[f]or any employer, because of the * * * sex * * * of any person, * * * to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." *Id.* The Ohio Supreme Court has recognized two distinct categories of sex discrimination claims, to wit: (1) "quid pro quo" harassment, *i.e.,* harassment that is directly linked to the grant or denial of a tangible economic benefit, and (2) "hostile environment" harassment, *i.e.,* harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment. *Hampel v. Food Ingredients Specialties, Inc.,* 89 Ohio St.3d 169, 176, 729 N.E.2d 726 (2000). In order to establish a claim of hostile work environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the 'terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment,' and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Id.* at 176–77, 729 N.E.2d 726; *Harmon v. GZK, Inc.,* 2002 WL 191598 (Ohio App. 2 Dist. Feb. 8, 2002). Under this standard, the nature of harassment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Bell v. Cuyahoga Community College,* 129 Ohio App.3d 461, 467, 717 N.E.2d 1189 (1998), *citing Faragher v. Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). "In analyzing sexual harassment claims, Ohio courts look to the statute, R.C. 4112.02(A), to the administrative counterpart [O.A.C. 4112–5–05(J)], and to federal case law interpreting Title VII of the Civil Rights Act of

1964, Section 2000e et seq., Title 42 U.S.C." *Edwards v. Dubruiel,* 2002 WL 31846259 (Ohio App. 2 Dist. Dec. 20, 2002); *Ohio Civ. Rights Comm'n v. Ingram,* 69 Ohio St.3d 89, 93, 630 N.E.2d 669, 672 (Ohio 1994) (federal case law interpreting Title VII is generally applicable to cases involving violations of Ohio Rev.Code Ch. 4112).

### 1. *Harassment was Unwelcome*

■ In his Memorandum in Opposition, Plaintiff states that Delphi does not challenge his assertion that the harassment was unwelcome (Doc. # 61 at 4). This statement is incorrect. Delphi asserts that Long and Engleman's conduct was not subjectively offensive, because "[h]ad plaintiff viewed the alleged conduct as offensive, he would not have volunteered to work with his alleged harassers" by taking his overtime during second shift. (Doc. # 53 at 10; Doc. # 66 at 3).

Construing the evidence in the light most favorable to Plaintiff, Greenwood has submitted evidence which raises a genuine issue of material fact as to whether the alleged harassment was unwelcome. He testified in his deposition that he repeatedly told Long not to make sexual comments to him (Greenwood Depo. I at 36–37, Greenwood Depo. II at 85–86), and that he filed a hostility report with Delphi against her (Greenwood Depo. I at 6). Plaintiff repeatedly testified in his deposition that Long's statements made him uncomfortable (*E.g.,* Greenwood Depo. II at 39–40). In addition, Plaintiff indicated that, due to Long and Engleman's conduct, he altered his work performance in that he began to make deliveries during his overtime period rather than during his normal shift, thus avoiding Long in the crib (*id.* at 195–99). Based on the evidence submitted by the parties, there is a genuine issue of material fact as to whether Plaintiff subjectively found Long and Engleman's conduct to be offensive. Accordingly, the Court con-

cludes that Delphi is not entitled to summary judgment, on the ground that the harassment was not unwelcome.

### 2. *Harassment is Based on Sex*

■ Turning to the "based on sex" requirement, under Ohio law, sexual harassment has been defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature. *Edwards, supra,* citing O.A.C. 4112–5–05(J). "To be of a sexual nature, verbal conduct must be gender related." *Id.* The Ohio Supreme Court has further held that harassing conduct that is simply abusive, with no sexual element, can support a claim for hostile-environment sexual harassment if it is directed at the plaintiff because of his or her sex. *Hampel, supra,* at 180, 729 N.E.2d 726; *Murphy v. Eggleston–Meinert Funeral Home, Inc.,* 2002 WL 31630763 (Ohio App. 6 Dist. Nov. 22, 2002).

Delphi has not disputed that the alleged harassment by Long and Engleman was based on sex. Regardless, the evidence supplied by Plaintiff indicates that Long repeatedly made comments of a sexual nature, and that Engleman gave Plaintiff a massage, which could be construed as sexual act. Accordingly, the Court concludes that there is a genuine issue of material fact as to whether the alleged harassment was based on sex.

### 3. *Harassment was Severe or Pervasive*

■ The United States Supreme Court has stated that, "in order to be actionable under [Title VII], a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct.

2275, 141 L.Ed.2d 662 (1998); *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367; *see Hampel,* 89 Ohio St.3d at 176, 729 N.E.2d at 732; *Bell,* 129 Ohio App.3d at 467, 717 N.E.2d 1189. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), citing *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, do not give rise to an actionable claim. *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275. This ensures that Title VII does not become a code of civility for the workplace, censuring people for behavior that is merely inappropriate. *Id.* "In determining whether the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment under the *Harris* standard, it is well-established that the court must consider the totality of circumstances." *Williams,* 187 F.3d at 562. Among the factors that the Court should consider in evaluating the pervasiveness of the alleged harassment are: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance. *Harris,* 510 U.S. at 23, 114 S.Ct. 367. "[E]ven where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." *Hampel,* 89 Ohio St.3d at 181, 729 N.E.2d at 736; *Williams,* 187 F.3d at 563.

In his Memorandum in Opposition to Delphi's Motion, Plaintiff indicates that he was sexually harassed by Long and Engleman during August and September of 1998, when:

- Engleman massaged his shoulders for a short period of time, *i.e.,* less than ten seconds.
- Plaintiff indicates that, during the first week of August, 1998, Long "got right up in my face, I mean that (indicating) close. I took a step back and she took a step forward and I kind of laughed and I said, what is the problem? And she said, you're fucking her, aren't you."
- Long sat on Plaintiff's desk and told him that Engleman thought that Plaintiff was stalking her (Engleman).
- Long measured Plaintiff's hand and stated, "Oh, you have a big one." Plaintiff understood that she was referring to his penis size.
- Long approached Plaintiff as he was bringing wine to a female co-worker, stating "You're taking that wine to that fucking ho in 14. You're fucking that slut in 14."
- Engleman stepped in front of his cart and "dressed [him] down pretty good."
- Long stated "you wouldn't be the first white man I've had sex with."

Plaintiff also points out that Long allegedly called him by nicknames, such as "honey," "sugar," "sweetie," "boo," and "lover." (Doc. # 53 at 6; Greenwood Depo. II at 151–52). Plaintiff has also complained of Engleman visiting Long at the tool crib, when the two would "act silly." In his Memorandum in Opposition to Delphi's Motion, Plaintiff further alleges that Long made repeated sexual comments during telephone conversations in July of 1998, such as asking Plaintiff what he would do if Engleman were lying naked on the carpet (Doc. # 61 at 3).

In its Motion, Delphi asserts that the alleged harassment was not objectively of-

fensive. It contends that conduct far more severe or pervasive has been held to be insufficient to support a sexual harassment claim. Delphi further argues that there is no evidence that the alleged conduct unreasonably interfered with Plaintiff's work performance. Plaintiff argues, citing *Bucher v. Sibcy Cline, Inc.*, 137 Ohio App.3d 230, 738 N.E.2d 435 (2000), that whether the harassment was severe or pervasive is a jury question.

In *Harmon v. GZK, Inc.*, 2002 WL 191598 (Ohio App. 2 Dist. Feb. 8, 2002), the Second District Court of Appeals reviewed whether three female employees at a fast food restaurant had provided sufficient evidence that they had been subject to severe or pervasive sexual harassment by their male co-workers. Plaintiff Pamela Harmon provided evidence that one co-worker, Larry Barrett, frequently requested anal sex from her. He also requested oral sex, told her that he would rape her, and threatened to hurt her and her children. In addition, Barrett frequently rubbed his body against Harmon, grabbed her buttocks on one occasion, and once forced her to sit on his lap. The court of appeals concluded that Harmon's evidence was sufficient to demonstrate that the alleged harassment was "severe or pervasive." *Id.* at *9. The second plaintiff, Crystal Steck, produced evidence that Barrett made frequent offensive comments to her, and that he grabbed her breast once and her buttocks once. Although the court of appeals noted that the harassment suffered by Steck was less physically threatening and intimidating than that suffered by Harmon, the court nevertheless concluded that it was more than "offensive utterances." Thus, Steck had likewise demonstrated that the harassment was severe or pervasive. *Id.* at *10. The third plaintiff, Sonya Johnson, provided evidence that she had been subject to offensive comments by Barrett, which occurred at least three times a week. She further alleged that another male employee brushed up against her, often with an erection, three or four times a week. She also witnessed harassing behavior toward other female employees. As with Harmon and Steck, the court of appeals found that such conduct was severe or pervasive. *Id.* at *12.

In *Williams v. General Motors Corp.*, 187 F.3d 553 (6th Cir.1999), the plaintiff alleged derogatory and profane remarks that were directed at her, sexually explicit comments directed at her, offensive comments about women in general, and denial of overtime. In particular, Williams' supervisor once stated, "You can rub up against me anytime," adding "you would kill me, Marilyn. I don't know if I can handle it, but I'd die with a smile on my face." *Id.* at 563. On another occasion, he put his arm around her neck and place his face close to hers, and noticing that she had written "Hancock Furniture Company" on a piece of paper, said, "You left the dick out of the hand." Finally, while Williams was bending over, her supervisor came up behind her and said, "Back up; just back up." The Sixth Circuit stated that, given these circumstances, summary judgment for the defendant was improper, reasoning "These incidents, which must be taken as fact for purposes of summary judgment, were not merely crude, offensive, and humiliating, but also contained an element of physical invasion." The court also stated that evidence of that the plaintiff was the subject of pranks further supported the existence of a hostile work environment.

The holding in *Williams* can be contrasted with the Sixth Circuit's prior decision in *Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir.1997). Therein, the Sixth Circuit reversed a jury verdict in the plaintiff's favor, holding that the sexual comments by male employees, although offensive and inappropriate, did not create

an objectively hostile work environment. Black had alleged that she was subjected to various discriminatory comments made at bi-weekly meetings from July to October of 1993. At a July meeting, a manager reached for a pastry, stating "Nothing I like more in the morning that sticky buns," while allegedly looking at Black in a suggestive manner. At the next meeting, the participants joked that a parcel of land located next to a Hooters Restaurant should be named "Hootersville," "Titsville," or "Twin Peaks." These jokes allegedly continued for several meetings. In August, Black was told by her manager that she was "paid great money for a woman." In a September meeting, employees joked about an individual whose name is pronounced "bosom." In October, Black was asked by the company president, "Say, weren't you there [at a biker bar] Saturday night dancing on the tables." Although the Sixth Circuit acknowledged that the alleged incidents occurred consistently over a period of four months, it held that the comments were "merely offensive" and were insufficient to support the jury's verdict. The Sixth Circuit noted that many of the comments were not directed at the plaintiff. *Id.* at 826; *see Burnett v. Tyco Corp.*, 203 F.3d 980 (6th Cir.2000) (discussing *Black* and *Williams* ).

■ In the present case, Greenwood has presented evidence of approximately ten specific instances of sexual harassment over a two to three month period, *i.e.*, end of July through September of 1998. Two of those instances involve close physical contact, to wit: (1) Engleman's unwelcome massaging of Plaintiff's shoulders, and (2) Long standing very close to Plaintiff, causing him to step backward, while asking him if he were having sex with another woman. Long's comments to Plaintiff were sexually explicit, including accusations that Plaintiff was having sex with other women and indications of her desire

to be in a sexual relationship with him. Her conduct was likewise sexually humiliating, in that she measured Plaintiff's hand, intimating the size of his penis. Given the totality of these circumstances, construed in the light most favorable to Plaintiff, the Court concludes that there is a genuine issue of material fact as to whether Long and Engleman's conduct was severe or pervasive. The alleged harassment was almost constant for a period of approximately two months. In addition, Plaintiff's allegations of sexual harassment, which he has supported with evidence, are analogous to the harassment suffered by Steck in *Harmon* and the plaintiff in *Williams*. As stated by the Sixth Circuit upon reversing a granting of summary judgment in *Williams*, "[t]hese incidents ... were not merely crude, offensive, and humiliating, but also contained an element of physical invasion." *See also Johnson v. Booker T. Washington Broadcasting Serv.*, 234 F.3d 501, 508–09 (11th Cir.2000) (severe or pervasive element satisfied when fifteen instances of harassment over four months, offensive behavior included unwanted massages, standing so close to the plaintiff's body that the harasser's body touched hers from behind; harasser pulled pants tight to reveal imprint of private parts; and conduct interfered with plaintiff's job performance). Accordingly, Delphi, Long and Engleman are not entitled to summary judgment, on the ground that the alleged harassment was not severe or pervasive.

4. *Whether Delphi Knew or Should Have Known of the Harassment and Failed to Take Immediate and Appropriate Action*

■ Employer liability for hostile work environment harassment varies depending upon whether the alleged harasser is a supervisor or a co-worker. When the alleged harasser is a supervisor, the employ-

er may be vicariously liable. *Peterson v. Buckeye Casings*, 133 Ohio App.3d 715, 723, 729 N.E.2d 813, 819 (Ohio App. 10 Dist.1999), citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763–765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). When the alleged harasser is not a supervisor but, rather, a co-worker, the employer may be liable to the plaintiff based on its own negligence. 729 N.E.2d at 819. Under this scenario, an employer may be liable where the employer knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action. *Id.*

Plaintiff asserts that Delphi supervisors knew of his complaints against Long and Engleman, even witnessed them, yet took no direct action. Plaintiff testified that he spoke with Mr. Mike Burton, his third shift supervisor (Greenwood Depo. II at 41), who recommended that he (Plaintiff) contact Mr. Riegle, as well as his union representative.[12] Plaintiff further stated that the December 10, 1998, meeting, which was run by the Delphi Labor Relations Department, did not deal with any of his sexual harassment complaints.

In its Motion, Delphi contends that it took prompt corrective action on Plaintiff's complaints. It argues that Plaintiff initially wanted to handle his problems with Long and Engleman without intervention by Delphi, and that by the time Greenwood asked Delphi to intervene, Plaintiff only complained of Engleman's visits to Long at the crib. Delphi further contends that it monitored the situation, and when no resolution could be reached, Ms. Bengry held a meeting with Plaintiff, Long and Engleman, which resolved the situation.

When a plaintiff fails to avail himself of the remedial procedures established by his employer, he may not later assert that his employer failed to take prompt corrective action. For example, in *Courtney v. Landair Transport, Inc.*, 227 F.3d 559 (6th Cir.2000), the Sixth Circuit rejected the plaintiff's contention that her employer failed to take prompt corrective action when it waited until December of 1996 to act. Therein, the plaintiff had sent correspondence to management on two occasions prior to December. In her May 5, 1996, letter, the plaintiff complained about a double standard that she perceived as a result of (1) having received a reprimand for wearing inappropriate clothing to work, and (2) several loose sexual references made around the terminal, some of which were directed towards her specifically. *Id.* at 565. In her correspondence, the plaintiff failed to name the alleged harassers or to ask her employer to take any particular action concerning her complaints. *Id.* The Sixth Circuit concluded that this correspondence was insufficient to put management on notice that plaintiff wanted it to intervene to stop the co-worker harassment. *Id.* In August of 1996, the plaintiff again wrote to management, in which she described more sexual references directed towards her but, again, she never asked management to address the problem. The Sixth Circuit concluded that the August letter likewise was not sufficient notice to her employer, reasoning that "because this correspondence is less than clear as to its purpose, it does not constitute notice to defendant." *Id.* The Court further con-

---

**12.** Plaintiff asserts that Henry Brannon also knew of the alleged sexual harassment, but did nothing. However, Plaintiff has not cited to any evidence that Mr. Brannon was a supervisor. In his deposition, Mr. Brannon indicated that he was a crib attendant prior to his retirement from Delphi (Brannon Depo. at 6–7). Accordingly, the Court will not discuss Mr. Brannon's alleged failure to take any action regarding Plaintiff's complaints of harassment.

cluded that it was not until December 4, 1996, when the employer received correspondence asking it to stop the harassment, that the employer had notice of the harassment. *Id.*

Likewise, in *Stepic v. Penton Media, Inc.*, 2000 WL 1867399 (Ohio App. 8 Dist. Dec. 14, 2000), the Eighth District Court of Appeals concluded that a plaintiff's claim against his employer was precluded when he failed to request that his employer address the alleged harassment. Therein, the plaintiff, a male, had reported in August of 1996 that he was being harassed by a female co-worker, alleging that she followed him, stared at him, had touched him on the shoulders, had asked to accompany him to a football game, and had made comments expressing an interest in him. *Id.* at *6. The plaintiff asked his supervisor not to discuss the matter with his alleged harasser, indicating he would handle the problem himself. He later indicated to the Human Resource Department that the matter had been resolved. *Id.* In January of 1997, the plaintiff again reported the matter to management, stating that "nothing had changed." Upon review of Plaintiff's sexual harassment claim, based on his initial August, 1996, report, the Eighth District Court of Appeals held that the plaintiff was precluded from recovering, as a matter of law, because he "unreasonably failed to avail himself of the employer's remedial apparatus." *Id.; see also Hinkle v. Dept. of Transportation*, 2002 WL 31972348 (Ohio Ct.Cl. June 11, 2002) (company took prompt corrective action when it had a policy against sexual harassment, it was disseminated to employees, it was

known to plaintiff, and prompt corrective measures were taken by defendant as soon as plaintiff's complaints were made known; plaintiff's earlier complaints were generally vague, and the plaintiff stated that she could take care of her problems herself).

 In the instant action, although Plaintiff informed Delphi management about a number of the alleged incidents of sexual harassment, until September of 1998, he also made clear that he did not want to file a complaint, and that he wanted to resolve the situation himself. Plaintiff testified that he mentioned the three incidents that occurred during the first week of August to "Mike Burton, Bill Riegle or somebody, but [he] didn't make a report." (Greenwood Depo. II at 32). He testified:

Q: Did you tell him [Mike Burton] that you didn't want to get anyone in trouble, you didn't want to report it?

A: I don't recall that, but I think it was obvious.

Q: So, you believe that he [Mike Burton] understood that you wanted to try to handle this yourself?

A: Yes.

(*id.* at 40–42).[13] Testifying about the massage incident, Plaintiff again stated that he wanted management to know that the incident had happened, but he did not ask his supervisor to rectify the situation (*id.* at 32–33). Plaintiff indicated that he did not "report" the massage incident until November 10, 1998, when he spoke with Mr. Seege (*id.* at 32). Plaintiff likewise testified that, although he mentioned other

---

**13.** Plaintiff later testified, apparently contradicting his prior testimony, that when he informed Mr. Burton of Long and Engleman's conduct, he would have liked "very much for management to do something [about it]." (Greenwood Depo. II at 103). However, he also reiterated that he wanted to resolve the situation himself:

Q: Up until this point where Ms. Long accused you of stalking Mrs. Engleman, up until that point you wanted to resolve this yourself?

A: Yes. The accusation took it to another level.

*Id.* at 104.

conversations between himself and Long and Engleman to Mr. Burton, he intended to resolve the situation without intervention by management (*id.* at 70–71). In fact, in late August of 1998, Plaintiff believed that he had accomplished this (*id.*). Plaintiff acknowledged during his deposition that he did not approach management (specifically, Mr. Burton) *for assistance* until Long informed Plaintiff that Engleman believed that he was stalking her and that she may get the police and friends involved (*id.* at 89). He indicated that, following his conversation with Long regarding his alleged stalking, he immediately went to Mike Burton and told him that he (Greenwood) would not tolerate the threats and accusations, and that he wanted management to make it stop (*id.*).

Thus, even construing Plaintiff's deposition testimony in the light most favorable to him, the evidence demonstrates that, until his "stalking conversation" with Long in September of 1998, Greenwood intended to resolve his conflict with Long and Engleman by himself, and that he had informed Mr. Burton of that intention. By making those representations to Delphi management, Plaintiff failed to take advantage of the remedial measures available to him from Delphi and, consequently, he did not trigger Delphi's obligation to take corrective action. Accordingly, as a matter of law, Plaintiff may not hold Delphi liable for its failure to take prompt corrective action, based on his complaints of harassment prior to the "stalking conversation" in September of 1998.

▪▪▪ Turning to the events subsequent to Plaintiff's "stalking conversation" with Long, Delphi may be held liable for the alleged sexual harassment if it failed to take proper remedial measures.

Once an employer is aware of and responds to charges of sexual harassment, though, mere negligence as to the content of the response cannot be enough to make the employer liable. When an employer responds with good-faith remedial action, we cannot say that the employer has itself committed an act of discrimination ... When an employer implements a remedy, it can be liable for sex discrimination in violation of Title VII only if that remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination.

*Blankenship v. Parke Care Cntrs., Inc.,* 123 F.3d 868, 873 (6th Cir.1997); *see also Fenton v. HiSAN, Inc.,* 174 F.3d 827, 829–830 (6th Cir.1999). The appropriateness of an employer's response depends on the frequency and severity of the alleged harassment. *Blankenship,* 123 F.3d at 872 (citing *Bell v. Chesapeake & Ohio Ry.,* 929 F.2d 220 (6th Cir.1991)); *Minnich v. Cooper Farms, Inc.,* 2002 WL 1396910, 39 Fed.Appx. 289 (6th Cir.2002). A response is generally adequate if it is reasonably calculated to end the harassment. *Jackson v. Quanex Corp.,* 191 F.3d 647, 663 (6th Cir.1999).

Plaintiff complained of a whispering campaign, in which Long and Engleman told co-workers that he was stalking Engleman. Plaintiff further complained that Engleman came by the crib on a nightly basis, during which she acted "silly," and that Long measured his hand. In its Motion, Delphi asserts that it took Plaintiff's allegations seriously, that it monitored the situation and responded whenever Plaintiff complained about Engleman's presence at the crib. It further notes that Plaintiff was given the opportunity to air his complaints at a meeting on December 10, 1998, which resolved the conflict.

In his deposition, Plaintiff indicated that he contacted Mr. Burton regarding Engleman's stalking allegation, and that Mr. Burton responded that he (Greenwood) should inform Mr. Riegle, contact his union representative, and keep him (Burton)

informed (Greenwood Depo. II at 92). Plaintiff contacted Mr. Riegle a few days later, indicating that he wanted the threats and accusations about his alleged stalking to end. (*id.* at 93). Mr. Riegle responded that he would be coming to the crib and checking to see if there were any problems (*id.* at 97). After speaking with Mr. Riegle, Plaintiff contacted Mr. Elam, his union representative. Plaintiff also spoke with Mr. William Monroe, his crib supervisor (*id.* at 44),[14] in which Plaintiff indicated that he "was having trouble with Crystal and the other young lady in that they were putting out rumors about him in the factory." (Monroe Depo. at 44). Specifically, Mr. Monroe was informed that Long and Engleman had stated that Plaintiff was stalking them and "had put out the word that he was a pervert." (Monroe Depo. at 29–30). Mr. Monroe testified that, after Plaintiff spoke with him, he in turn contacted Marlane Bengry, the Personnel Director at Delphi. Ms. Bengry informed Mr. Monroe that she was already aware of the problem and that someone was investigating (*id.* at 25–26). After the hand-measuring incident, Plaintiff informed Mr. Monroe of that conduct as well as their comment that they (Long and Engleman) felt that Plaintiff could handle them both (*id.* at 29). Mr. Monroe again contacted Ms. Bengry to notify her of this occurrence (*id.* at 30).[15]

■■■ Upon review of the evidence, Plaintiff has not provided evidence to create a genuine issue of material fact that Delphi failed to take prompt corrective action. The parties have provided evidence that, prior to the December 10, 1998, meeting, Plaintiff frequently contact-

ed Mr. Riegle or Mr. Burton whenever Engleman visited the crib (Greenwood Depo. II at 126–28), and they came to the crib to monitor the situation (*id.*). Plaintiff testified that, on November 10, 1998, Seege, as the union representative concerned with sexual harassment complaints, came to the crib to interview Plaintiff regarding his complaints (*id.* at 203–04). Plaintiff and Seege spoke for approximate forty-five minutes (*id.* at 208). Plaintiff testified that Seege indicated that he would take Plaintiff's information to Labor Relations (specifically, Marlane Bengry and Barry Ray), and that a meeting would be scheduled with Plaintiff, Long, Engleman, Ms. Bengry, Mr. Ray, and himself (*id.* at 214–15).

In his Memoranda, Plaintiff asserts that Delphi's response was inadequate in two respects. *First,* he argues that his complaints concerning sexual harassment were not addressed during the December 10th meeting. *Second,* he asserts that Delphi's sexual harassment policy was deficient. Beginning with Plaintiff's first argument, Greenwood has provided no evidence that, during the December 10, 1998, meeting, he presented his allegations of sexual harassment, other than his complaint that Long and Engleman were spreading rumors about him and that Engleman was visiting the crib. Although Plaintiff asserts that his sexual harassment complaints were not addressed, it is undisputed that the meeting resulted in Plaintiff, Long and Engleman's agreement to avoid each other (Bengry Depo. at 79). Plaintiff has not dispute Delphi's assertion that there have been no claims of continued harassment since that meeting.

---

**14.** Plaintiff indicated that Mr. Monroe is normally on first shift (Greenwood Depo. II at 44).

**15.** The Court notes that Mr. Monroe further testified that Mr. Monroe not seem upset by the

hand-measuring incident, but that Plaintiff appeared upset by the spreading of rumors (Monroe Depo. at 49–50). Mr. Monroe further indicated that Plaintiff did not ask him to do anything about the sexual comments by the two women (*id.* at 50).

Plaintiff's argument that Delphi failed to establish appropriate procedures for investigating or interviewing witnesses or complainants concerning sexual harassment complaints is also unavailing. In support of this argument, Plaintiff cites to Ms. Bengry's deposition testimony, in which she discusses the procedures that a complainant should take. Ms. Bengry testified that a complainant should first try to resolve the situation by talking to the offending co-employee (Bengry Depo. at 50). If that fails to stop the harassment, the complainant should contact his or her supervisor, who should interview both employees and investigate the situation (*id.* at 54). If those efforts fail, the supervisor may call in the union or Human Relations (*id.*). Ms. Bengry acknowledged that the sexual harassment manual and training video do not state, step by step, how to investigate a sexual harassment complaint (*id.* at 59). Defendants have responded that Plaintiff acknowledged that Delphi had a zero tolerance sexual harassment policy, and that signs regarding sexual harassment were placed at entrances to the plant (Greenwood Depo. I at 69–70). Plaintiff further was required to attend a sexual harassment awareness program (Greenwood Depo. II at 110–11). Construing the evidence in the light most favorable to Plaintiff, the Court cannot conclude that Delphi lacks a sexual harassment policy or that the policy is so deficient that it demonstrates an indifference to sexual harassment complaints. *See Idusuyi v. State of Tenn. Dept. of Children's Servs.,* 30 Fed. Appx. 398, 2002 WL 220640 (6th Cir.2002). Accordingly, Plaintiff has not created a genuine issue of material fact that Delphi's response to his complaints was inadequate.

In summary, Plaintiff has failed to create a genuine issue of material fact that Delphi failed to take appropriate remedial measures in response to his complaints. Initially, Plaintiff indicated that he would handle the situation himself, thus failing to give Delphi proper notice of its need to take corrective action. Once Plaintiff complained of the rumors by Long and Engleman, the evidence indicates that management responded to his complaints by monitoring the situation, initiating an investigation, and ultimately holding a meeting to resolve the situation. It is undisputed that Plaintiff has made no further complaints since that meeting. Based on the foregoing, Delphi is entitled to summary judgment on Plaintiff's sexual harassment claims, on the ground that it took appropriate corrective action. Accordingly, Delphi is entitled to summary judgment on Plaintiff's sexual harassment claim, pursuant to Ohio Rev.Code Ch. 4112 (Count One).

## C. *Breach of the Duty of Fair Representation Claim (Count Two)*

In his Complaint, Plaintiff asserts that Defendants IUE Local 755, Clark, Heizer and Harm ("the Union Defendants") failed to investigate and to take action on his complaints of harassment. Upon removing the case, Defendants asserted that this claim was completely preempted by § 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, and is properly construed as a § 301 claim of breach of the duty of fair representation. Plaintiff has not challenged this assertion.[16]

---

**16.** Although Plaintiff has not challenged this Court's federal question subject matter jurisdiction, the Court is obligated to assure itself that same exists. *Campanella v. Commerce Exchange Bank,* 137 F.3d 885, 890 (6th Cir. 1998) ("federal courts have a continuing obli-

gation to inquire into the basis of subject-matter jurisdiction to satisfy themselves that jurisdiction to entertain an action exists"). Section 301 of the LMRA provides the means to enforce agreements between unions and employers:

In their Motion for Summary Judgment (Doc. # 55), the Union Defendants argue that Count Two must be dismissed, because it was not timely filed. They assert that claims of breach of the duty of fair representation are subject to a six month statute of limitations, and that Plaintiff's claim was filed subsequent to the expiration of that time period. Plaintiff responds that the Union Defendants' failure to represent him continued until he filed his Complaint. He further asserts that he has stated claims against the Union Defendants, which are subject to Ohio's four year statute of limitations, set forth in Ohio Rev.Code § 2305.09.

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). It is well-established that claims of breach of the duty of fair representation, coupled with a claim against the employer for violation of the collective bargaining agreement, have been labeled "hybrid § 301 claims." *DelCostello v. Teamsters*, 462 U.S. 151, 164, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). Although claims of breach of the duty of fair representation may be raised as part of a hybrid § 301 claim, there is no requirement that a fair representation action include a concomitant claim against an employer for breach of contract. *Breininger v. Sheet Metal Workers Intern. Ass'n Local Union No. 6*, 493 U.S. 67, 80, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989). "The duty of fair representation does not arise out of a collective bargaining agreement." *Storey v. Local 327, Intern. Broth. of Teamsters*, 759 F.2d 517 (6th Cir.1985). Rather, "it flows from the union's statutory position as exclusive representative and exists both before and after the execution of an agreement." *Id.; see Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Section 9(a) of the NLRA, in conjunction with 28 U.S.C. § 1337, creates a jurisdictional basis for actions for breach of the duty of fair representation which arise independent of a cause of action against an employer or a union for claims resulting from breach of a collective bargaining agreement. *Pratt v. United Automobile, Aerospace and Agricultural Implement Workers of America, Local 1435*, 939 F.2d 385, 388 (6th Cir.1991).

Herein, it is questionable whether Plaintiff has alleged a hybrid § 301 claim against the union, thus providing a basis for removal to this Court under that statute. Plaintiff's allegations against Defendants IUE Local 755, Clark, Heizer and Harm are based on their alleged failure to investigate and to take action on his complaints of harassment. There are no allegations in either the Complaint or in Plaintiff's memoranda concerning the pending motions for summary judgment that Delphi breached the collective bargaining agreement. In other words, although Plaintiff has alleged that he attempted to file labor grievances, there is no allegation (nor have the parties directed the Court to any evidence) that those grievances relate to Delphi's actions. Accordingly, Plaintiff's unfair representation claim appears to have been raised without the presence of a § 301 claim against his employer. Despite the apparent absence of a hybrid § 301 claim, Plaintiff's unfair representation claim is a federal claim, which is properly before the Court, pursuant to § 9(a). In addition, it was readily apparent from the Complaint that Plaintiff was asserting a federal breach of the duty of fair representation claim. Accordingly, the Court concludes that it had federal question subject matter jurisdiction over Plaintiff's unfair representation claim at the time of removal and that same continues to exist at this time. *See Ackley v. Local Union 337, Intern.Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America*, 910 F.2d 1295, 1303 (6th Cir. 1990), vacated on other grounds, 948 F.2d 267 (6th Cir.1991) (where the record and pleadings demonstrated that both parties to this action assumed and understood that the plaintiffs' action was predicated on a violation of section 9(a), the failure to plead such a violation explicitly, or the jurisdictional statute specifically, was not fatal to their maintenance of the action). The Court reiterates that Plaintiff has not objected to this Court's subject matter jurisdiction.

Plaintiff's argument that his breach of the duty of fair representation claim is governed by Ohio Rev.Code § 2305.09 is unsupportable.[17] "The duty of fair representation relates to an area of labor law which has been so fully occupied by Congress so as to foreclose state regulation." *Maynard v. Revere Copper Prods., Inc.,* 773 F.2d 733, 735 (6th Cir. 1985). Thus, whether stated in terms of federal or state law, a claim for breach of the duty of fair representation is governed by federal law. *Moore v. International Broth. of Elec. Workers,* 51 Fed.Appx. 486, 2002 WL 31056022 (6th Cir.2002) (quoting *Maynard,* 773 F.2d at 735)("[W]hen a federal claim of a breach of the duty of fair representation is barred by the six-month statute of limitations, 'it would be anomalous to hold that the same claim survived the defense of limitations because it was stated in terms of state law.' ").

In *DelCostello v. Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the Supreme Court established that claims under § 301 of the LMRA are governed by a six month statute of limitations. This six month statute of limitations applies for unfair representation claims, regardless of the presence of a section § 301 claim against the employer, *i.e.,* a hybrid § 301 claim. *Adkins v. International Union of Elec., Radio & Mach. Workers,* 769 F.2d 330, 335 (6th Cir.1985) (stating that section 10(b) applies "to all unfair representation claims, regardless of the nature or presence of the section 301 claim" against the employer.). A claim for breach of the duty of fair representation accrues "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *See Adkins v. International Union of Electrical, Radio & Machine Workers,* 769 F.2d 330, 335 (6th Cir.1985); *Noble v. Chrysler Motors Corp.,* 32 F.3d 997, 1000 (6th Cir. 1994). The statute of limitations begins to run when the employee knew or should have known of the union's final action or the employer's final action, whichever occurs later. *Robinson v. Central Brass Mfg. Co.,* 987 F.2d 1235, 1238 (6th Cir. 1993); *Schoonover v. Consol. Freightways Corp.,* 49 F.3d 219, 221 (6th Cir.1995); *Bickers v. International Assoc. of Machinists and Aerospace Workers,* 8 Fed.Appx. 514, 2001 WL 493411 (6th Cir.2001).

In support of their Motion, the Union Defendants cited to Plaintiff's deposition testimony, in which he testified that union representative Steve Elam refused to file a grievance on his behalf (Doc. # 55 at 9, 18). Plaintiff further testified that he might have mentioned his complaints of harassment to Mr. Stan Long and Mr. Heizer, but did not ask them to file a grievance (Greenwood Depo. II at 188–89).[18] However, he further testified that, by December of 1998, he had lost hope of receiving assistance from the union. Specifically, Plaintiff testified:

Q: But as I understand your testimony, Mr. Elam refused to file a grievance concerning your problems with Ms. Engleman and Ms. Long, right?

A: Correct.

---

17. Plaintiff also appears to argue that his sexual harassment and intentional infliction of emotional distress claims are governed by the Ohio statute of limitations. The Union Defendants have not argued that these state law claims have been completely preempted by federal law, nor have they asserted that § 301's statute of limitations is applicable to these claims. Accordingly, Plaintiff's additional arguments, to the extent that they have been asserted, are not disputed and, therefore, will not be addressed.

18. In addition, Plaintiff reported the alleged harassment to Mr. Riegle and Mr. Burton (Greenwood Depo. at 116). Mr. Riegle and Mr. Burton are members of Delphi management (*id.* at 12).

Q: When was this?

A: September.

Q: Of?

A: '98. October, November, December, he never filed a grievance.

Q: Okay. At that point did you have any hope that he would file a grievance on your behalf concerning Ms. Engleman and Ms. Long?

A: I became a little disenchanted, yes.

Q: Now, what about Stan Long ... ? ... He would have filed a grievance on your behalf?

A: If I'd ask have asked him.

Q: But you didn't ask him?

A: No.

Q: Why not?

A: At that point in time it was beyond a grievance. I saw the Union and the company weren't going to do anything.

Q: So you gave up on the Union?

A: I gave up on the Union, yes.

Q: Now, your wife testified that you told her that you gave up about getting any help with the Union about the time of the meeting with Marlene, is that correct?

A: Pretty close to that, yes.

* * * * * *

Q: And this would be December of '98?

A: '98.

(Greenwood Depo. IV at 47–49). Based on this testimony, the Union Defendants assert that the six month statute of limitations on Plaintiff's breach of the duty of fair representation claim began to run, at the latest, in December of 1998, because Plaintiff should have known, at that time, of the union's decision not to pursue any grievances for him.

Plaintiff responds that the Union Defendants never represented him regarding his complaints against Long and Engleman, and that he could not get fair representation, because his complaints concerned another co-worker/union member. However, Plaintiff has not provided evidence that he was unaware of the Union Defendants' decision not to file grievances on his behalf until January of 2000, i.e., six months prior to the filing of this lawsuit. Accordingly, the uncontroverted evidence indicates that Plaintiff was aware, by December of 1998, that the union representatives would not be filing grievances on his behalf regarding his complaints of sexual harassment and hostile work environment. Thus, the statute of limitations for Plaintiff's claim of breach of the duty of fair representation began to run at that time. Plaintiff's breach of the duty of fair representation claim was filed on June 30, 2000, more than six months after December of 1998. Accordingly, that claim must be dismissed as untimely filed. The Union Defendants' Motion for Summary Judgment on Plaintiff's breach of the duty of fair representation claim (Count Two) is SUSTAINED.

D. *Negligent and Intentional Infliction of Emotional Distress (Count Three)*

In Count Three, Plaintiff alleges that Heizer, Harm, Clark, Seege, Long and Engleman conspired to inflict emotional distress on him. Consequently, those Defendants seek summary judgment on Count Three, alleging, in part, that Plaintiff cannot establish a civil conspiracy claim. In his Memoranda in Opposition (Doc. # 61, Doc. # 62, Doc. # 63), Plaintiff contends that Count Three of the Complaint should be construed as setting forth claims of negligent and intentional infliction of emotional distress. He rejects the argument that he has alleged a civil conspiracy claim.[19] In light of Plaintiff's argu-

---

19. In opposing Delphi's Motion for Summary Judgment, Plaintiff argues that Delphi has

failed to move for summary judgment on his negligent and intentional infliction of emo-

ment, the Court will construe Count Three as setting forth claims of negligent and intentional infliction of emotional distress only.

### 1. *Allegation of a Conspiracy to Commit Emotional Distress*

Before turning to the elements of Plaintiff's claims, the Court must address his allegation that Clark, Harm, Heizer, Seege, Long and Engleman conspired to inflict emotional distress on him. In essence, Plaintiff has alleged that the conduct of these Defendants should be considered a joint enterprise, and that the actions of one Defendant may be imputed to the others.

The Court agrees with Plaintiff that, under certain circumstances, it may be reasonable to consider the effect of one individual's conduct on the reasonableness of another's actions. Plaintiff has both argued and provided evidence that Long and Engleman acted together, that each acted to further Plaintiff's interest in the other, and that they made sexual comments concerning each other to him. Under these circumstances, the Court concludes that the conduct of Long and Engleman may be considered collectively. In other words, Long's alleged sexual harassment of Plaintiff will be imputed to Engleman, and vice versa. With regard to Clark, Harm, Heizer and Seege, however, Plaintiff has provided no evidence that they "conspired" with Long and Engleman, or with each other, to harass him. Because the record is devoid of evidence that the Union Defendants acted in concert, the Court does not consider it reasonable to evaluate any of their individual conduct based on the apparently independent actions of the other Defendants. Accordingly, the actions of the

tional distress claim. Delphi responds that it was not named in Count Three of the Complaint. Delphi is correct. Accordingly, the

Union Defendants will be considered separately.

### 2. *Negligent Infliction of Emotional Distress*

■ Under Ohio law, claims of negligent infliction of emotional distress are generally limited to instances where the plaintiff is a bystander to an accident or was in fear of physical consequences to his own person. *Gearing v. Nationwide Ins. Co.*, 76 Ohio St.3d 34, 40, 665 N.E.2d 1115, 1120 (Ohio 1996); *Bunger v. Lawson Co.*, 82 Ohio St.3d 463, 466, 696 N.E.2d 1029 (Ohio 1998); *Heiner v. Moretuzzo*, 73 Ohio St.3d 80, 86–87, 652 N.E.2d 664 (Ohio 1995). "The tort of negligent infliction of emotional distress assumes that a bystander or witness to a sudden, negligently caused event is traumatized by its emotionally distressing occurrence." *Johnson v. General Motors Corp.*, 2001 WL 1913820 (Ohio App. 5 Dist. Oct. 17, 2001); *Mason v. United States Fid. & Guar. Co.*, 69 Ohio App.3d 309, 316, 590 N.E.2d 799, 804 (Ohio App. 1 Dist.1990).

Herein, Plaintiff has provided no evidence that he was a witness to a sudden, negligently caused occurrence or was placed in physical peril by same. Accordingly, Plaintiff's claim of negligent infliction of emotional distress must fail, as a matter of law. *See Johnson*, 2001 WL 1913820 (rejecting negligent infliction of emotional distress in harassment setting, where not a bystander to a negligent act or put in physical peril by same); *Hale*, 2002 WL 191588; *Motley v. Flowers & Versagi Court Reporters*, 1997 WL 767466 (Ohio App. 8 Dist. Dec. 11, 1997). Defendants' Motion for Summary Judgment on Plaintiff's negligent infliction of emotional distress claim (portion of Count Three) is SUSTAINED.

Court will not include Delphi in its analysis of Count Three.

**1072**

### 3. *Intentional Infliction of Emotional Distress*

■ To establish a claim of intentional infliction of emotional distress, Plaintiff must provide evidence that: (1) Defendants intended to cause emotional distress, or knew or should have known that their actions taken would result in serious emotional distress; (2) Defendants' conduct was extreme and outrageous; (3) Defendants' actions proximately caused Plaintiff's psychic injury; and (4) the mental anguish Plaintiff suffered was serious. *Hanly v. Riverside Methodist Hosps.*, 78 Ohio App.3d 73, 603 N.E.2d 1126 (1991); *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666 (Ohio 1983). "Extreme and outrageous" has been described as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager*, 453 N.E.2d at 671; *Meyers v. Hot Bagels Factory, Inc.*, 131 Ohio App.3d 82, 721 N.E.2d 1068 (1999). The Ohio Supreme Court has adopted Section 46(1) of the Restatement of Law 2d, Torts (1965) and the accompanying comments as standards to be used in deciding emotional distress cases. *Id.* In particular, that court has quoted comment d, which states, in pertinent part:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized commu-

nity. Generally, the case is one in which the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be "freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam."

*Yeager*, 453 N.E.2d at 671, quoting Restatement (Second) of Torts § 46(1), comment d. Defendants assert that they are entitled to summary judgment on Plaintiff's claim of intentional infliction of emotional distress, on the ground that Plaintiff cannot establish that they engaged in extreme and outrageous conduct.

■ Beginning with the conduct of the Union Defendants, those Defendants note that Plaintiff has asserted that Harm and Heizer stood outside his work station and glared at him (see Doc. # 63 at 4). Plaintiff has not articulated any additional wrongful conduct by Harm and Heizer in his memoranda.[20] With regard to Seege, Plaintiff

---

**20.** In his Second Affidavit, attached to his Memorandum in Opposition to the Union Defendants' Motion (Doc. # 63), Plaintiff alleges that Harm and Heizer made derogatory comments about him and disparaged him to other co-workers, stood outside his work station and glared at him, showed documentation and discussed details of Plaintiff's lawsuit with union members, (Greenwood Depo. II).

With regard to Seege, Plaintiff has asserted that he failed to conduct an impartial investigation of his complaints (*id.* ¶ 19–23). Plaintiff has alleged that Clark insisted that Seege handle the investigation of Plaintiff's complaints, threatened Plaintiff's job if Greenwood got him (Clark) involved, and assigned Heizer and Harm as Plaintiff's union repre-

has asserted that he failed to conduct an impartial investigation of his complaints. Plaintiff has not articulated the wrongful conduct by Clark in any memorandum. Construing Plaintiff's allegations against Harm, Heizer, Clark and Seege in the light most favorable to Plaintiff, none of the alleged conduct rises to the level of extreme and outrageous conduct. Harm, Heizer, Seege and Clark are entitled to summary judgment, as a matter of law.

■ With regard to Plaintiff's claims based on the actions of Long and Engleman, a number of courts have addressed intentional infliction of emotional distress claims, which are based on sexually harassing conduct. In *Perry v. Textron, Inc.*, 1997 WL 598398 (Ohio App. 1 Dist. Sept. 26, 1997), the plaintiff alleged that a male co-worker sexually harassed her, battered her, and intentionally caused her emotional distress when he repeatedly touched her hands and upper thigh, and caressed her calf. In addressing her claim for intentional infliction of emotional distress, the court of appeals concluded that the co-worker's conduct, while inappropriate, was not so outrageous and extreme to

create a genuine issue of material fact for a jury. Accordingly, the court affirmed the trial court's grant of summary judgment.[21] *See also Retterer v. Whirlpool Corp.*, 111 Ohio App.3d 847, 856, 677 N.E.2d 417, 423 (Ohio App. 3 Dist.1996)(receipt of blow-up dolls, cartoons, and an item labeled a "penis warmer" were insufficient to establish extreme and outrageous conduct).

The Sixth Circuit has also addressed what constitutes extreme and outrageous conduct in the sexual harassment context. In *Summerville v. Ross/ Abbott Laboratories*, 187 F.3d 638, 1999 WL 623786 (6th Cir.1999), the plaintiff alleged that her co-worker had made "unwelcome lewd jokes, comments, body movements and baring of body parts, as well as sexual come-ons and unwelcome touching." The Sixth Circuit concluded that the plaintiff's intentional infliction of emotional distress claim was properly dismissed, because no reasonable juror would believe that her co-worker's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

---

sentatives (*id.* ¶ 17–18, 28–29). Plaintiff does not cite to this affidavit in his memoranda. The Court was made aware of it by the Union Defendants' Reply Memorandum (Doc. # 65), in which they assert that the affidavit is replete with hearsay and statements of which Plaintiff lacks personal knowledge. The Union Defendants argue that, due to these defects, the affidavit should be disregarded by the Court. Plaintiff has not responded to this argument.

The Court agrees with Defendants that the affidavit contains numerous statements that constitute hearsay. However, even considering those statements, Plaintiff's allegations do not rise to the level of extreme and outrageous conduct by the Union Defendants. See *Shepard v. Griffin Servs., Inc.*, 2002 WL 940110 (Ohio App. 2 Dist. May 10, 2002)(extreme and outrageous conduct not alleged when plaintiff asserted that defendant purposefully discriminated against her based on

her sex; defamed her reputation and character by accusing her of fraud, falsification of records and deception, without properly ascertaining the truth of the accusations; published private and confidential information about her counseling to virtually all Griffin Services' employees; retaliated against her for engaging in a protected activity and making complaints of discrimination; and terminated her employment based upon false accusations and an incomplete investigation of events); *Dickerson v. Internatl. United Auto Workers Union*, 98 Ohio App.3d 171, 648 N.E.2d 40 (1994) (threats by union against plaintiffs, who crossed picket line, were not extreme and outrageous).

**21.** The plaintiff in *Perry* had also asserted a sexual harassment claim. The court of appeals affirmed summary judgment for the defendant, on the ground that the plaintiff had not demonstrated a genuine issue of material fact regarding respondeat superior liability.

regarded as atrocious, and utterly intolerable in a civilized community," as required under Ohio law.[22] In *Griswold v. Fresenius USA, Inc.*, 964 F.Supp. 1166, 1174–75 (N.D.Ohio 1997), the district court likewise rejected a claim for intentional infliction of emotional distress, in which the plaintiff (a male) alleged that the defendant (also a male) made sexual comments to him, such as "give me a kiss" and "you have a sexy ass;" touched his chest, sides, and shoulders; put his arm around the plaintiff; and frequently puckered his lips toward the plaintiff. The court concluded that the allegations constituted insults, indignities and annoyances of the sort to which liability does not extend, and that they did not rise to the level of outrageousness required to sustain a claim for intentional infliction of emotional distress. *See also Hartleip. v. McNeilab, Inc.*, 83 F.3d 767, 777 (6th Cir.1996) (allegations that defendant threatened plaintiff's employment stability, applied pressure on her on a weekly basis to engage in conduct that she had no interest in pursuing, constantly called and wrote to her, and discussed sexual fantasies with other employees about her was insufficient to state intentional infliction of emotional distress claim)(applying Michigan law).

In the present case, Plaintiff has provided evidence that Engleman gave Plaintiff a brief, unwanted massage; that Long measured Plaintiff's hand and stood very close to him, and that Long made a number of sexual comments to him. Although this conduct clearly is inappropriate and constitutes "insults, indignities, and annoyances," it does not rise to the level of "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency," as a matter of law. Accord-

ingly, Long and Engleman's Motion for Summary Judgment on Plaintiff's Intentional Infliction of Emotional Distress Claim (portion of Count Three) must be SUSTAINED. Accordingly, Defendants are entitled to summary judgment on Count Three of Plaintiff's Complaint.

### E. Loss of Consortium Claim (Count Four)

Defendants assert that the Naoka Greenwood's loss of consortium claim must be dismissed, because she cannot establish that Plaintiff suffered a bodily injury as a result of their alleged conduct. Defendants based their argument on *Bowen v. Kil–Kare, Inc.*, 63 Ohio St.3d 84, 585 N.E.2d 384 (Ohio 1992), in which the Ohio Supreme Court stated: "[W]e recognize that a claim of loss of consortium is derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers *bodily* injury." 63 Ohio St.3d at 93, 585 N.E.2d at 392 (emphasis added). Plaintiff relies upon *Clouston v. Remlinger Oldsmobile Cadillac, Inc.*, 22 Ohio St.2d 65, 258 N.E.2d 230 (1970), noting that, although the claim arose out of an automobile accident in which her husband was physically injured, the court held that a wife has a loss of consortium claim against a person who negligently injures her husband. Because the *Clouston* court did not expressly state that a physical injury was required, Plaintiff suggests that it supports the conclusion that same is not required.

The Court need not determine whether Mrs. Greenwood's claim must fail, as a matter of law, due to the lack of physical injury to her husband. Because each of

---

**22.** As with *Perry,* the Sixth Circuit affirmed summary judgment on the sexual harassment claim, on the ground that the plaintiff had not demonstrated a genuine issue of material fact regarding adequacy of her employer's response to her claims of harassment. It did not address whether the alleged conduct was severe or pervasive.

Plaintiff's claims must be dismissed, there is no remaining claim from which Mr. Greenwood's claim may derive. Accordingly, Defendants are likewise entitled to summary judgment on Mrs. Greenwood's loss of consortium claim (Count Four).

## IV. *Plaintiff's Motion for Summary Judgment (Doc. # 67)*

Plaintiff seeks summary judgment on Long and Engleman's counterclaims of defamation and abuse of process. In his Motion (Doc. # 67), Plaintiff asserts that the defamation claim must fail, because (1) he spoke only the truth and (2) the claim is time-barred by the statute of limitations. With regard to the abuse of process claim, Plaintiff argues that he had a right to sue and that his lawsuit did not constitute perversion of the judicial system.

Beginning with Long and Engleman's defamation claim, Defendants concede that it is governed by the one year statute of limitations, set forth in Ohio Rev.Code § 2305.11, and that, consequently, it is time-barred. Because Long and Engleman agree that their defamatory statements were made more than one year before the filing of their defamation counterclaim, Plaintiff's Motion for Summary Judgment on that counterclaim is SUSTAINED.

Greenwood argues that Long and Engleman's abuse of process claim must also be dismissed, stating that it is a "rehashing" of their defamation claim. Plaintiff argues that he has a legal right to institute litigation based on Long and Engleman's alleged sexual harassment and that it was not a perversion of the legal process. Plaintiff further asserts that the abuse of process claim was filed subsequent to the expiration of the statute of limitations. Long and Engleman respond that their abuse of process claim is timely. They further contend that Plaintiff's assertion that his claim was justly filed merely satisfies the first element of the abuse of process claim.

In *Yaklevich v. Kemp, Schaeffer & Rowe*, 68 Ohio St.3d 294, 626 N.E.2d 115 (1994), the Ohio Supreme Court stated that the four-year statute of limitations period contained in Ohio Rev.Code § 2305.09 applies to an abuse of process claim. 68 Ohio St.3d at 300, 626 N.E.2d at 119–20. Long and Engleman's abuse of process claim was filed within the statutory time limitation. Accordingly, Greenwood's Motion for Summary Judgment, on statute of limitations grounds, is OVERRULED.

The elements of an abuse of process claim are: (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted in an attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process. *Yaklevich*, 68 Ohio St.3d 294, 626 N.E.2d 115 (1994), paragraph one of the syllabus. "In a typical case, the abuse of process does not arise out of the same transaction or occurrence that is the subject matter of the underlying claim, but arises from events occurring during the course of the underlying litigation." *Automation Tool Die, Inc. v. Cook*, 2002 WL 31890141 (Ohio App. 9 Dist. Dec. 31, 2002), citing *id.* at 299, 626 N.E.2d 115; *see Moffitt v. Litteral*, 2002 WL 31105394 (Ohio App. 2 Dist. Sept. 20, 2002) (abuse of process requires the proceeding to be instituted or continued with probable cause, while a malicious prosecution claim requires the proceeding to be instituted without probable cause).

Herein, Plaintiff has asserted, and Long and Engleman agree, that his lawsuit was instituted with probable cause, thus satisfying the first element of the abuse of process claim. Plaintiff further states that his lawsuit does not constitute a perversion of the judicial process.[23] Long and Engleman have provided no evidence that he has used his litigation for an ulterior purpose. Accordingly, Long and Engleman have not created a genuine issue of material fact that Greenwood engaged in an abuse of process. Plaintiff's Motion for Summary Judgment on Long and Engleman's abuse of process claim is SUSTAINED.

For the foregoing reasons, Defendants' Motions for Summary Judgment (Doc. # 52, Doc. # 53, Doc. # 55) are SUSTAINED. Likewise, Plaintiff's Motion for Summary Judgment on Long and Engleman's counterclaims (Doc. # 67) is SUSTAINED.

Judgment to be entered accordingly.

WHEREFORE, the captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

---

23. Long and Engleman contend that Plaintiff has not challenged the second and third elements of their abuse of process claim. The Court disagrees. Plaintiff has asserted that no perversion of the judicial process has occurred, thus challenging Long and Engleman's ability to establish the second element of that claim.